RANDY'S STUDEBAKER SALES, INC.,
d/b/a Randy's Datsun Sales,
Plaintiff-Appellee,

v.

NISSAN MOTOR CORPORATION IN
U.S.A., Defendant-Appellant.

No. 75–1348.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 28, 1976.

Decided April 2, 1976.

Rehearing Denied May 4, 1976.

Daniel L. Berman of Berman & Giauque, Salt Lake City, Utah (Douglas J. Parry of Berman & Giauque, and Lowell V. Summerhays, Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Merlin O. Baker of Ray, Quinney & Nebeker, Salt Lake City, Utah (Jonathan A. Dibble of Ray, Quinney & Nebeker, Salt Lake City, Utah, and Lillick, McHose & Charles, Los Angeles, Cal., on the brief), for defendant-appellant.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

DOYLE, Circuit Judge.

The appellant has appealed from a judgment entered against it on a jury verdict in the amount of $600,000 in favor of Randy's Studebaker Sales, Inc., d/b/a Randy's Datsun Sales. Violations of Sections 1 and 2 of the Sherman Antitrust Act and violations of the Automobile Dealer Franchise Act, 15 U.S.C. Sections 1221–25 were alleged. In essence Nissan Motor Corporation was charged with conspiring with Datsun dealers to eliminate competition in the retail distribution of new Datsun automobiles and to eliminate particularly the competition of the plaintiff as a Datsun dealer in the Salt Lake market. The jury found in favor of the defendant under the Sherman Antitrust Act. The damage award was given in the claim under the Automobile Dealers Franchise Act.

Randy's theories under the Automobile Dealer's Act were, first, that Nissan had failed to act in good faith in performing or complying with the obligations of an automobile manufacturer under the dealership agreement in that it had discriminated against the plaintiff in the distribution and allocation of automobiles and, secondly, that the Nissan Company had failed to act in good faith in refusing to renew plaintiff-appellee's Dealer Sales and Service Agreement; that Nissan was motivated by its desire to eliminate Randy's from competition; third, that Nissan failed to act in good faith in that it coerced Randy's through threats and other conduct in an effort to compel abandonment of its facilities and market area and relocation in a new, smaller market, thereby removing Randy's from the competitive scene.

The cause has been here before. On the prior occasion, Nissan had appealed the preliminary injunction decree which had enjoined defendant from terminating the dealership of plaintiff and from failing to provide as many automobiles as Nissan provided to the other dealers in Salt Lake. The injunction against failure to provide an equal number of cars was modified by this court so as to maintain the status quo. Otherwise, it was affirmed.

The underlying controversy has had a considerable history dating back to a time soon after the initial grant of the franchise by Nissan, the distributor for Datsun vehicles, parts and accessories in the continental United States. The first written franchise was given to Randy's in June 1966. Thereafter, this agreement was renewed periodically. During the period in question an effort was made by Nissan to move Randy's to larger facilities at a different location, but this never came about. Conflicting evidence was presented as to the willingness of Randy's to move. There was also evidence that Nissan had thwarted a proposed move by installing a new dealer in a proposed location. The only substantial change in Randy's facilities occurred in 1972 with the addition of a parts area.

The problem from the standpoint of Randy's was a shortage of vehicles during most of the period of the franchise. Its evidence was that it sold virtually every new Datsun that was delivered. There were two additional dealerships installed in Salt Lake City, Clines in 1968, and Schettler-Williams in 1970. The result was that Randy's had less automobiles to sell. Randy's testimony established that his method of competing with the other two Datsun dealers was by price competition. The other dealers complained to Nissan, and the latter warned Randy's to keep its gross margins—and thus the retail price—high.

Geographically, the other two dealers were relatively close to Randy's, and soon after their installation Nissan started a campaign to persuade Randy's to move out to the suburbs. Randy's was unwilling to go to the place suggested, Bountiful, Utah, for the reason that a previous Datsun dealer had gone bankrupt there in 1968. According to Randy's evidence, there was a willingness on its part to move to Granger, Utah, but that did not materialize.

In 1972 Randy's was informed about a new means of allocating cars to the Salt Lake City market. This was based on dealers' "planning potential"—an estimate based on the percentage of the market which a dealer could be expected to penetrate. Since Datsuns were in short supply, so it was argued, the "planning potential" was an important factor in the allocation of cars. Randy's maintained that its "planning potential" was arbitrarily arrived at—that it had no relation to the number of cars that it was able to service. The sum total of the program, according to the evidence on Randy's part, was that the supply of new Datsuns to Randy's was diminished and the supply of the other two Salt Lake dealers was increased. The number of cars allocated to Randy's in 1972 was insufficient to allow it to break even using its traditional pricing policies.

The final franchise agreement between these parties expired on April 23, 1973. On that occasion Nissan notified Randy's that

its franchise was not to be renewed. Instead, it conditioned a renewal on Randy's acquisition or construction of larger facilities, on its hiring additional workers, increasing working capital and increasing sales performance. November 30, 1973 was the deadline for accomplishing these objectives, but on August 17, 1973, Randy's filed the present lawsuit claiming violation of the Sherman Act, 15 U.S.C. Sections 1, 2, and the Automobile Dealer Franchise Act, *supra*. The allegation in the complaint was that the termination had occurred because Randy's had refused to follow Nissan's resale price maintenance policies and had failed to conform to Nissan's competitive price maintenance policies.

The district court granted a preliminary injunction on December 11, 1973. This directed Nissan to supply Randy's with at least as many cars as were supplied to other Datsun dealers in the market area. Nissan appealed the order to this court and obtained the modification mentioned, that is, an allocation of cars equal to the number that had been furnished rather than an increased quota.[1] The cause was tried and judgment was entered in favor of Randy's on March 26, 1975, on the count of violation of the Automobile Dealer Franchise Act, *supra*.

On this appeal Nissan advances the following points (among others):

1. That the Automobile Dealer Franchise Act does not apply to the facts in this case.

2. That an incorrect measure of damages has been adopted and awarded.

3. That it was error to receive in evidence certain ad hoc surveys.

4. That it was error for the court to take judicial notice of the preliminary injunction.

Being of the opinion that none of these contentions are meritorious, we affirm.

## I.

▮ The Franchise Act gives to an automobile dealer a federal cause of action against an automobile manufacturer who fails to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise. *See* 15 U.S.C. Section 1222.

Good faith is defined as the duty of a dealer and a manufacturer "to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. Section 1221. One proviso excludes "recommendation, endorsement, persuasion, urging, or argument" as constituting a lack of good faith. *Id.* Also, the cases have considered mere arbitrariness by a manufacturer as not giving rise to a claim under the Act.[2]

▮ It would appear then that the manufacturer's action in order to lack good faith must be unfair and inequitable in addition to being for the purpose of "coercion" or "intimidation." The problem becomes difficult in the individual case because the standards are not clear for determining whether the conduct involved qualifies as unfair and inequitable and as being coercion or intimidation. The distinction between illicit pressure and simple recommendation, endorsement, persuasion, urging, etc., is equally difficult. Legislative history does not provide clarification. House Report No. 2850, 84th Cong., 2d Sess. (1956), 1956 U.S.Code Cong. & Admin.News, pp. 4596, 4603, says

Manufacturer coercion or intimidation or threats thereof is actionable by the

---

1. In September 1974, prior to trial, Randy's sold its business, including its new and used car inventory, tools, equipment, and parts to Bountiful Datsun for $34,800. Randy's also entered into a covenant not to compete for $45,000, to be paid over a four-year period.

2. *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 573 (10th Cir. 1975); *Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 712 (10th Cir. 1970). *See also Overseas Motors, Inc. v. Import Motors, Ltd.*, 519 F.2d 119, 125 (6th Cir. 1975) (citing cases); Note, 74 Yale L.J. 354, 357–59 (1964); Note, 62 Mich.L.Rev. 310 (1963).

dealer where it relates to performing or complying with any of the terms or provisions of the franchise, or where it relates to the termination, cancellation, or nonrenewal of the dealer's franchise.

The Report goes on to say:

Thus, where a dealer's resistance to manufacturer pressure is related to cancellation or nonrenewal of his franchise a cause of action would arise.

However, the Report is quick to explain that the manufacturer is not prohibited from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation and, further, that the Act does not prevent a manufacturer from cancelling or not renewing an ineffective or undesirable dealer's franchise. Also, appointment of added dealers according to the House Report is a normal competitive method for securing a better distribution. Hence, curtailment of this "would be inconsistent with the antitrust objectives of this legislation." 1956 USCCAN, pp. 4603–04.

The Committee Report specifies one practice which constitutes coercion or intimidation and that is pressure by the manufacturer on the dealer to accept automobiles, parts or accessories or supplies not needed. Thus an effort to compel a dealer to sell a specified quota of its automobiles, parts or accessories would be coercion. This is in contrast to normal sales recommendation or persuasion. The line may indeed be thin between normal recommendation and coercion or intimidation.

█ It is important to be mindful that it was the unequal bargaining power between the manufacturer and the dealer and the abuses resulting therefrom that brought about the enactment. The purpose of Congress was to balance the power now heavily weighted in favor of automobile manufacturers. *See* 1956 USCCAN, p. 4596.

To ascertain the meaning of good faith it is necessary to examine the cases. Thus, a manufacturer who refuses to renew a franchise is not guilty of lack of good faith where the dealer has failed to comply with the franchise terms for a long period of time.[3] Nor in the case of one who has had sub-standard sales performance.[4] Or if the dealer should have inadequate financial resources, termination of the franchise is not in bad faith.[5] Elimination of a dealer who has sold its manufacturer-approved location and seeks to move to a location not in keeping with the manufacturer's metropolitan planning does not establish a lack of good faith on the part of the manufacturer.[6] And where the dealer refuses to take all of the manufacturer's line of cars, choosing instead to continue to deal in competitor cars, lack of good faith is not shown by refusal to renew the franchise.[7]

3. *Woodard v. General Motors Corp.*, 298 F.2d 121 (5th Cir.), *cert. denied*, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962).

4. *Kotula v. Ford Motor Co.*, 338 F.2d 732 (8th Cir. 1964), *cert. denied*, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *see also Milos v. Ford Motor Co.*, 317 F.2d 712 (3rd Cir.), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963).

5. *Pierce Ford Sales Co., Inc. v. Ford Motor Co.*, 299 F.2d 425 (2d Cir.), *cert. denied*, 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962).

6. *Salco Corp. v. General Motors Corp.*, 517 F.2d 567 (10th Cir. 1975).

7. *David R. McGeorge Car Co. v. Leyland Motor Sales*, 504 F.2d 52 (4th Cir. 1974). In *McGeorge* the manufacturer cut the dealer's supply of Triumphs in an effort to persuade the dealer to deal also in Rover and Land Rover automobiles. The dealer refused to accept the Rover line. It was already carrying a competing line of luxury foreign cars, the Mercedes Benz. The Fourth Circuit held that the conduct of the manufacturer in shorting McGeorge in the delivery of Triumphs in its effort to compel acceptance of Rover and Land Rover constituted a lack of good faith under the Act. The court said that a manufacturer's coercive attempt to force unwanted automobiles on a dealer during the franchise term constituted bad faith dealing for purposes of the Act. It was the tying arrangement which was ruled to demonstrate the requisite lack of good faith. At the same time, it was indicated that the full line requirement could be imposed in connection with franchise renewal.

The exertion of pressure on a dealer to give up a separately-located dealership in a competing line has been held to evidence a lack of good faith on the part of the manufacturer.[8]

The decision of the Second Circuit in *Autowest, Inc. v. Peugeot*, 434 F.2d 556 (2d Cir. 1970), is particularly helpful in solving the problem at bar, for this was an effort to maintain prices by threats, coercion and finally termination. In this case the Second Circuit through Judge Lumbard said:

> While each case necessarily presents questions as to the Act's reach, we hold that coercion and subsequent termination for failure to adhere to a manufacturer's suggested resale price to dealers states a cause of action.

434 F.2d at 561.

The court did not feel that *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) was applicable because that was a Sherman Act case which involved concerted action with respect to retail price fixing. The target of the manufacturer in *Autowest* as indeed in the case at bar was price control with respect to a single dealer. The Second Circuit opinion recognized that an unfair trade practice was being employed which, regardless of whether it violated the Sherman Act, was sufficient to establish the requisite lack of good faith.

To look at the problem another way: There are two essential elements to a Sherman Act Section one violation, an unreasonable restraint of trade and a contract, combination, or conspiracy to attain it. The Franchise Act reaches those activities of an automobile manufacturer which would constitute an unreasonable restraint of trade under the Sherman Act or another invalid

trade practice. In the lack of good faith evaluation the presence or absence of such invalid trade practices is, of course, a foremost consideration.

Bad faith also was held to exist where a manufacturer during the term of the franchise sought to drive a dealer out of business by deliberately supplying insufficient cars. *Junikki Imports, Inc. v. Toyota Motor Co.*, 335 F.Supp. 593 (N.D.Ill.1971).[9]

In the case at bar Nissan used the non-renewal weapon to coerce the dealer into a program of retail price fixing. The evidence also supports the factual conclusion that Nissan curtailed substantially the supply of new Datsuns in its effort to bring about price maintenance and so as to suppress price competition. It also sought to force appellee to spend large sums of money in capital improvements which could be deemed an effort to force appellee to raise its prices in order to be on a profit basis and thereby to be non-competitive price-wise. Randy's theory was that unless it could have continued price competition it was impossible for it to stay in business.

In the light of the facts and the cases defining lack of good faith, we hold that the evidence was adequate to establish a violation of the Automobile Dealer Franchise Act.

## II.

We next consider whether the standards prescribed by the trial court to govern the jury in determining the amount of a damage award were correct and whether the evidence was sufficient. The court's charge contained the stock explanations. such as that which advises the jury not to misconstrue the fact that a damage instruction is

---

8. *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).

9. The decision in *Junikki* arose on denial of the motion to dismiss and thus the merits were not presented. However, there, as in the case at bar, the conduct offered for the purpose of showing bad faith was the withholding of a supply of cars, parts and equipment. Allegedly this was aimed at coercing the dealer to relin-

quish his franchise. The court ruled that oral promises to furnish a sufficient supply of automobiles was a part of the contract and ruled also that the withholding of an adequate stock in furthering a disenfranchisement scheme constituted bad faith and a violation of the Act. The reason was that the withholding of stock essential to pay the overhead could quickly disenfranchise the dealer.

being given as an indication that some damage should be found together with the explanation that difficulty of computation does not mean that damages are not to be awarded.

In general, the theory or basis of the damages was that of loss of profits resulting from the discriminatory allocation together with loss of future profits from the loss of the franchise.

■ The Dealers Franchise Act is silent on the measure of damages, but inasmuch as the standards contained in the charge sought to submit actual loss measured by loss of profits, present and future, it is not objectionable and no exception is taken to it. In essence, the main complaint found in Nissan's argument is that the evidence of damage is conjectural and inadequate, and so we examine it in that light.

Randy's evidence was presented primarily through the testimony of an expert, Frank Stuart, a management consultant. He described two elements of damage: lost profits from 1970–73 caused by the discriminatory allocation of cars, and lost future profits occasioned by Nissan's failure to renew the franchise agreement.

As to the profits lost through discriminatory allocation: Stuart made computations, based first on the assumption that Randy's would have received and could have sold the same number of cars as Cline's, and a computation based on the average of cars sold by Cline's and Schettler-Williams. In each case, the number of cars that Randy's should have received (computed both ways) was multiplied by the "net profit per new unit sold" to obtain the lost profits. Net profit per new unit sold, which, Stuart testified, was a Nissan calculation, was obtained by deducting the variable expenses from gross profits and dividing by the number of cars sold. Nissan objected at the time to its introduction, reasoning that there was no evidence in the record to support the assumption that Randy's would have been

allocated or received the same number of cars as the other two dealers. The court overruled the objection.

Nissan's objection to the introduction of evidence regarding the loss of future profits was also overruled. In computing lost future profits, Stuart determined the average of the before-tax net operating income for 1972 and 1973, obtained from Randy's records. To this figure he added the profits lost from discriminatory allocation, computed in the two ways as above. Finally, he added the profits Randy's actually made. He testified that the sum produced the average net profit for 1972 and 1973, which he selected as representative years. He used this figure to project Randy's earnings over a 10-year period, discounted to present value.

The sum of Randy's damage claims—for loss of profits from discriminatory allocation and lost future profits—were set out in plaintiff's exhibit 87.[10] The two methods of computation, using the Cline's comparison and the Cline's/Schettler-Williams comparison, were presented to the jury as alternatives. Using the Cline's comparison, Randy's claimed $1,321,600 in damages; using the Cline's/Schettler-Williams comparison, Randy's claimed $845,400. The jury awarded $600,000 in damages.

■ On appeal, Nissan argues that the evidence was not sufficient to support the damage claims.[11] It contends that there was nothing in the record to substantiate Stuart's assumptions regarding the number of cars that Randy's would have been allocated or have received in the absence of discrimination. We are mindful that computations by experts cannot be based on conjecture or be unsupported by the record. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 86 (9th Cir. 1969); *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819 (M.D.Tenn.1974), but, here, Stuart's damage

10. Supporting figures and calculations were contained in plaintiff's exhibits 79 through 86. The exhibits were available to the jury during its deliberations.

11. Nissan also claims that the introduction of exhibit 87 was error for substantially the same reasons that it contends that the damage claim was error.

calculations were based on records and data that were put into evidence through both testimony and exhibits, all of which were available to the jury during its deliberations.

Nissan also points out that Randy Larsen, the owner of Randy's, had no opinion regarding the number of cars he would have received or sold. While damage claims may not be speculative, they also do not have to be mathematically precise; it is sufficient if damages are proved to a reasonable certainty. *Garvin v. American Motors Sales Corp.*, 202 F.Supp. 667 (W.D.Pa. 1962), *reversed on other grounds*, 318 F.2d 518 (3d Cir. 1963); *Cecil Corley Motor Co., Inc. v. General Motors Corp., supra*. And, where the defendant's wrongdoing created the uncertainty, it must bear the risk of that uncertainty and cannot complain. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970); *Garvin v. American Motors Sales Corp., supra.* Given a finding by the jury that Nissan discriminated in the allocation of cars, that wrong contributed substantially to the uncertainty regarding the number of cars that Randy's would have received without the discrimination; Nissan, then, is in an unfavorable position to complain of an uncertainty created by its own wrongdoing.

Nissan also contends that Stuart's assumption that the discriminatory allocation began in 1970 was contrary to Randy Larsen's testimony that the discrimination did not begin until the latter part of 1971. This discrepancy was brought to Stuart's attention during cross-examination, and he had an opportunity to explain why he calculated the damages from 1970.[12] The jury, having heard both pieces of testimony, was in a position to determine which was the more credible and to assess damages accordingly.

Nissan further contends that Stuart's alternative assumptions regarding allocation of cars were based on plaintiff's counsel's theories and not his own opinion expressed in the answers to interrogatories, which was that Randy's should have received half of the cars in the market. The shift in assumptions also was elicited in testimony before the jury, which was able to make its own evaluation.

Nissan has also argued that Stuart's use of variable net profit, which is gross profit less variable selling expenses, in his damage computations was error. It contends that Stuart should have deducted fixed overhead costs as well, and it relies on *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819, 855–58 (M.D. Tenn.1974) as authority for its position. In *Corley* the court found that it was error to rely on variable net profit in computing damages when both expert witnesses testified that variable net profit was not the same as net profit. Here, Stuart, when asked on both direct and cross-examination why he had made no deduction for fixed overhead costs, testified that he had relied on Nissan policy statements that fixed overhead costs are covered by profits from service and parts sales. He stated that an increase in costs created by increased sales activity would be absorbed by the increased revenue from parts and service that also would be generated by increased sales. Since there was evidence that, pursuant to Nissan's own policy, fixed overhead costs are covered by profits from parts and service, it was not error to use a variable net profits figure in calculating damages.

Finally, Nissan contends that the projection of lost profits over a ten-year period was too speculative. But recovery for loss of future profits is permissible under the Act.[13] *Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *American Motors Sales Corp. v. Semke*, 384 F.2d

---

12. He said that he chose 1970 as his starting point because that is when Schettler-Williams took the location that Randy's wanted for its relocation.

13. Recovery is not necessarily limited to one year's lost profits even if the franchise was renewable on an annual basis.

192 (10th Cir. 1967); *see also*, Annotation: Damages for Wrongful Termination of Automobile Dealership Contracts, 54 A.L. R.3d 324 (1973); "The Elusive Measure of Damages for Wrongful Termination of Automobile Dealership Franchises", 74 Yale L.J. 354 (1964). Moreover, the submission of a detailed report, made by a dealer and his comptroller, with a factual basis for its assumption, and which projects increased sales and profits over a ten-year period, to the jury with the possibility of an award of future profits for 10 years was not error. *Autowest, Inc. v. Peugeot*, 434 F.2d 556 (2d Cir. 1970).

Further, this court, in *American Motors Sales Corp. v. Semke*, 384 F.2d 192 (10th Cir. 1967), approved the following instructions:

> And in fixing the damages, if any, which you find from a preponderance of the evidence were sustained by plaintiff, as a proximate result of "bad faith" of the defendant, as defined in these instructions; you may take into consideration that period of time, which in your judgment, from a preponderance of the evidence, the profits, if any, would have accrued to plaintiff, in this case, had the franchise not been terminated; not to exceed in any event, the amount sued for on this count . . ."

*Id.* at 199, n. 6.

Although it did not set an explicit standard for determining how far into the future damages could be recovered, the court declared that:

> To be meaningful, such damages must include the amount of money that the dealer could have obtained in the future from the profits from his franchise. Therefore, we believe that instruction

number 11 (quoted above) given as to the law applicable to recovery for termination correctly stated the law.

*Id.* at 200.

In the instant case, Judge Ritter gave substantially the same, in parts verbatim, instruction as was approved in *Semke* : [14]

> . . . you may take into consideration that period of time during which, in your judgment from a preponderance of the evidence, the profits, if any, would have accrued to the plaintiff had the franchise relationship not been unlawfully terminated by Nissan.

On cross-examination Stuart testified that he chose 10 years because Randy Larsen had operated an automobile dealership successfully for 10 years prior to the non-renewal of the franchise, and he had every reason to believe that Randy's could have continued for 10 years into the future. Further, much of the testimony and exhibits focused on the management and profitability of Randy's dealership. In light then of the record, we believe that there was evidence upon which the jury could base a finding regarding the period of time for which Randy's would have made profits, absent Nissan's wrongful conduct.

### III.

Nissan has taken strong exception to the admission in evidence of Exhibits 28 and 29, a questionnaire which was completed by selected customers of Randy's. It pertained to the quality of the service. These questionnaires were sent out after the litigation started. According to the testimony of Randy Larsen, he decided to poll his customers so as to ascertain whether the service was as poor as Nissan claimed it was.[15]

---

14. *See*, "The Elusive Measure of Damages for Wrongful Termination of Automobile Dealership Franchises", 74 Yale L.J. 354 (1964), which concludes that lost profits is an appropriate, flexible measure of damages when the jury is properly instructed. "The lost profits measure is, moreover, particularly flexible in that it allows a court to submit the issue of damages to the jury with such limiting instructions as are appropriate in the context of the particular case and the policy of the act. If courts act reasonably to control the discretion of juries, recoveries should be sufficiently large

to deter bad faith conduct on the part of manufacturers and sufficiently small to allow manufacturers to terminate inefficient dealers without thereby assuming the risk of having to pay exorbitant damages should they mistakenly be found to have terminated wrongfully." *Id.* at 378.

15. The questionnaire was as follows:

1. What is your general overall rating of the Service Department of Randy's Datsun Sales?

__Excellent  __Good  __Satisfactory  __Poor

There were submissions to 100 to 120 customers during September 1973. Sixty to seventy responses were received and all of them gave favorable ratings to the Service Department. Sixty-five questionnaires were introduced into evidence. Thirty-one were without written comments, whereas thirty-four had some comments.

One problem revolves around the motion of Nissan in January 1974 to obtain production of all documents. Also, in June 1974, Larsen was deposed and asked whether he had any documents other than tax returns, financial statements, etc. He was asked whether he had any documents that related to the functioning of the dealership. The surveys were not produced. They were at the time in the hands of Randy's attorney. Nissan objected on the ground that there was a failure to produce them until two days prior to trial and, secondly, that they were hearsay and were not business records. They also said that there was no foundation as to whether they were a representative group.

A stipulation in the pretrial order was to the effect that all documents of the respective parties were to be considered as documents prepared and kept in the ordinary course of business and all documents produced by either party were utilized by that party in its business and relied upon by that party. Further, there was a stipulation that every document produced by either party was to be regarded as authentic, whereby copies could be used at the trial as if they were originals. The trial court simply ruled that this stipulation was broad enough to cover the surveys and that a survey such as the instant one constituted ordinary business practice.

■ Surveys such as these are not universally excluded. Indeed, the tendency has been to admit them if they have been properly conducted. *See* Annotation: Admissibility and Weight of Surveys or Polls . . ., 76 A.L.R.2d 619 (1961), Section 3, together with the cases cited. The hearsay problem is not an obstacle generally. *See Bank of Utah v. Commercial Security Bank*, 369 F.2d 19 (10th Cir. 1966), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967). Some courts have admitted them on the theory that they are not hearsay and are not offered testimonially. *See Sunbeam Corp. v. Sunbeam Furniture Corp.*, 134 F.Supp. 614, 619 (N.D.Ill.1955). An alternative theory for their reception is that they are within the exception of the hearsay rule with respect to present state of mind. *See Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (5th Cir. 1973); Annotation, 76 A.L.R.2d 619 (1961), Section 6; *see, Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 682, 686 (S.D.N.Y.1963); [16] *see also*, in general, 6 Wigmore, Evidence, Section 1714 (3d ed.); McCormick on Evidence, Section 294 (2d ed.) [17]

■ We are of the opinion that the questionnaires were properly admitted to reflect the then existing state of mind of the customers as to the quality of Randy's service generally.

2. Have you been able to obtain the service desired at the time you wanted it?

___All of the time   ___Most of the time
___Some of the time   ___Seldom

3. Have you been satisfied with the quality of the service performed?

___Very satisfied   ___Satisfied   ___Unsatisfied

4. Has Randy's been able to perform the services which were required?

___All of the time   ___Most of the time
___Some of the time   ___Seldom

There was a space at the bottom of each form for the respondent's name, address, and telephone number.

In all of the questionnaires, Randy's was rated in the top two categories of each question. All of the written comments were favorable.

16. In *Zippo, supra* surveys such as this were received based on necessity and probative value as well as a circumstantial guarantee of trustworthiness.

17. *Cf.* Federal Rules of Evidence 803(3), which took effect August 1, 1975, several months after the trial in this case.

A further argument of Nissan is that the surveys do not represent the broad scope which they purport to cover. The cases do not hold that all customers must be polled. A poll of customers within a specific period is ordinarily considered reasonable. *See Bank of Utah, supra,* wherein the group sample was not representative of the larger group and some individuals had been deleted from the tabulation, but here the surveys of customers during a particular period of time without restriction as to the group was used and so there is little basis for objection. Nor do we think that there is a valid objection based on technical inadequacy. The cases hold in any event that this bears on weight rather than admissibility. *See Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir. 1973); *Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 75 (10th Cir. 1958); *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 682–686 (S.D.N.Y.1963); Annotation, 76 A.L.R.2d 619 (1961) Section 16.

It is to be noted also that Nissan's counsel carefully cross-examined Larsen as a result of which the jury was fully aware of its shortcoming.

Considering, then, the nature and character of the survey, the manner of taking it and the state of the law, it was not error for the court to receive it.

### IV.

Finally, strong exception is taken to the trial court's judicially noticing the preliminary injunction. This we do not regard as error since the court may take judicial notice of its own records, especially in the same case. *Duhart v. Carlson,* 469 F.2d 471 (10th Cir. 1972), *cert. denied,* 410 U.S. 958, 93 S.Ct. 1431, 35 L.Ed.2d 692 (1973); *Bryant v. Carleson,* 444 F.2d 353 (9th Cir. 1971); *Dixon v. Jacobs,* 138 U.S. App.D.C. 319, 427 F.2d 589 (1970); 9 Wigmore, Evidence, Section 2579 (3rd ed.); McCormick on Evidence, Section 330 (2d ed.).

It is also argued by Nissan that the court committed error in failing to instruct the jury that taking notice of the preliminary injunction was not an indication that it was properly decreed. As in most instances in which a limiting instruction is requested, it would be helpful if one had been given. More frequently than not, however, the trial court fails to give these admonitions, and yet looking at the charge as a whole the reader would have to agree that it was not only comprehensive, it was fair, and it was plain from that charge that the jury was bound to determine the case on the evidence presented in the law of the case.

Being convinced that there was not prejudicial error, the judgment is affirmed.