EMPIRE VOLKSWAGEN, INC., et
al., Plaintiffs,

v.

WORLD–WIDE VOLKSWAGEN
CORP., Defendant.

No. 81 Civ. 5038 (SWK).

United States District Court,
S.D. New York.

Jan. 24, 1986.

As Amended Feb. 27, 1986.

See also 95 F.R.D. 398.

es occupied by the three car dealerships. Defendant World-Wide Volkswagen Corp. ("World-Wide"), distributes Volkswagen in New York, Connecticut, and New Jersey.

Plaintiffs bring eight claims against the defendant, all arising out of the franchise relationship between Empire Volkswagen, Empire Porsche Audi, and World-Wide Volkswagen, which began in September, 1975 and ended in February, 1981. Plaintiffs bring their claims under the federal and state antitrust laws, federal and state legislation protecting automobile franchises, and common law contract and tort principles. Defendant asserts two counterclaims for the purchase price of goods it allegedly sold to plaintiffs.

The case is currently before the Court on defendant's motion for judgment on the pleadings and in the alternative, for summary judgment. For the following reasons, defendant's motion is GRANTED in part and DENIED in part.

A party is entitled to a judgment on the pleadings if, based on the pleadings themselves, the party is entitled to relief. Fed. R.Civ.P. 12(c). When matters outside the pleadings are presented to the Court, the motion shall be treated as one for summary judgment under Fed.R.Civ.P. 56. Since the parties have made extensive submissions in the form of affidavits and exhibits, the Court will treat the motion as one for summary judgment.

A motion for summary judgment lies only when there is no genuine issue of material fact. This Court's role is to determine whether there are issues to be tried. *Heyman v. Commerce and Ind. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). The burden is on the moving party to show that no such issues exist. *Addickes v. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Heyman,* 524 F.2d at 1320. Nonetheless, "the mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a con-

Robinson, Perlman and Kirschner, P.C., by Lawrence M. Rosenstock, Jay D. Lukowski, New York City, for plaintiffs.

Rosenman Colin Freund Lewis & Cohen, by Arnold I. Roth, Arthur S. Linker, Lee A. Barkan, Judy A. Suben, New York City, for defendant.

KRAM, District Judge.

Plaintiff Empire Volkswagen, Inc. ("Empire Volkswagen"), was previously engaged in the retail sale of automobiles in Poughkeepsie, New York, pursuant to a franchise agreement with defendant. Plaintiff Empire Volkswagen d/b/a Empire Porsche Audi, Inc. ("Empire Porsche Audi"), sold Porsche and Audi automobiles, also in Poughkeepsie, pursuant to a franchise agreement with the defendant. Plaintiff Empire City Motors, Inc. ("Empire City"), sold Ford automobiles at the same location in Poughkeepsie. Plaintiff Donald Amerling alleges he was the majority owner of the three businesses at all relevant times. Plaintiff Susanne Properties Corp. ("Susanne Properties"), owned the premis-

vincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (emphasis in original). Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.

## I. *Federal Antitrust Claims*

### A. *Exclusive Dealing*

Plaintiffs allege that following its commencement as a Ford dealer in May, 1977, defendant attempted to impose an exclusive car dealing policy on them through a number of discriminatory actions, including decreasing the number of cars it shipped to them for sale. This, plaintiffs claim, violated Section One of the Sherman Act, 15 U.S.C. § 1, and Section Three of the Clayton Act, 15 U.S.C. § 14.

■ Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies in restraint of trade. 15 U.S.C. § 1. Section 3 of the Clayton Act prohibits a person from selling goods on the condition that the purchaser not deal in the goods of a competitor, where the effect of such condition might lessen competition in the particular line of commerce. 15 U.S.C. § 14. Exclusive dealing requirements are not *per se* illegal, but rather, are prohibited under both Acts only if performance of the exclusive dealing arrangement will foreclose competition in a substantial share of the line of commerce affected. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). The threshold question under both Acts, however, is whether an exclusive dealing arrangement did in fact exist. *Id.* at 330, 81 S.Ct. at 629.

Defendant has shown there are no material facts at issue regarding plaintiffs' exclusive dealing charges. In September, 1975 Empire Volkswagen opened. In October, 1975, Empire Porsche Audi opened. Neither of the franchise arrangements required plaintiffs to deal exclusively in Volkswagens, Porsches, or Audis. Empire Volkswagen and Empire Porsche Audi both operated out of the same facility. In May,

1977, Empire City commenced operations as a Ford dealership, using the same showroom and facilities as Empire Volkswagen and Empire Porsche Audi.

■ The defendant's policy concerning exclusive dealing was to allow its dealers to sell the automobiles of another manufacturer provided they did so from a separate facility. Plaintiffs clearly understood this to be defendant's policy.

The undisputed established facts show the dealership arrangement defendant attempted to impose on plaintiffs was not an exclusive arrangement. Plaintiffs remained free to sell automobiles provided by other manufacturers, provided they did so from other facilities. *See White and White, Inc. v. American Hospital Supply Corp.*, 540 F.Supp. 951, 1028 (W.D.Mich. 1982) (if the buyer retains the freedom to purchase the product from sellers of its own choosing, there is no exclusive arrangement), *rev. on other grounds*, 723 F.2d 495 (6th Cir.1983). Although plaintiffs recognize that they were free in principle to deal with Ford, they argue that this freedom was illusory because plaintiffs did not have the capital to open a separate facility. This argument is misguided. Defendant did not attempt to coerce the plaintiffs into an exclusive dealership arrangement, but to require plaintiffs to sell Ford cars from separate facilities. Defendant was permitted to impose this restriction, regardless of plaintiffs' financial circumstances.

■ Plaintiffs also have submitted evidence indicating that defendant induced them to begin their dealership even though it was undercapitalized, and knew about plaintiffs' financial difficulties when defendant urged them to open new facilities. They thus allege defendant's actions were in bad faith. Such allegations of bad faith dealing are not cognizable antitrust claims.

### B. *Resale Price Maintenance*

Plaintiffs' second antitrust claim is that defendant penalized them for failing to sell cars at defendant's suggested retail prices.

They allege that defendant's actions were in furtherance of a retail price maintenance scheme in violation of 15 U.S.C. § 1.

 Resale price maintenance schemes are *per se* illegal under Section One of the Sherman Act. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 775, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). However, unilateral action by a party to set retail prices is not illegal. *Id.* An antitrust plaintiff must prove a scheme to set prices between at least two parties.

The plaintiff has the burden of presenting sufficient evidence to prove the existence of an agreement to fix prices. *Id.*, 104 S.Ct. at 1470. To carry its burden:

something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently.... [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective."

*Id.* at 1471, *quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111, n. 2 (3d Cir.1980), *cert. den.*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

 Evidence that retailers complained to distributors that other retailers were selling at a discount does not remove a plaintiff's burden of proving the existence of an agreement to fix prices. *Id.*, 104 S.Ct. at 1471, n. 8. A plaintiff must show an actual agreement and prove that the manufacturer sought the retailer's agreement to maintain prices, and that the retailer communicated its agreement to do so to the manufacturer. *Id.* at 1471, n. 9. An agreement between a manufacturer and only one retailer to fix prices is sufficient to prove an agreement. *Id.* at 1472.

 Even considering plaintiffs' exhibits and affidavits as true, they fail to demonstrate an agreement between World-Wide and its distributor to fix prices. While defendant threatened its dealers that it would take harsh action if they discounted, none of the threats contained any reference to agreements between World-Wide and dealers, and all of the threats were unilateral. For example, R.W. Josenhanss, defendant's executive vice-president, told the dealers that if he caught them selling cars "under maximum gross profit, I will make it tough...." Dep. of Larry Winters at 85.[1] Such unilateral attempts by a distributor to set retail prices are not illegal, and there is no evidence that any of the dealers agreed not to discount prices.

Defendant's other alleged attempts to force plaintiffs to stop discounting—including direct threats and decreasing Empire Volkswagen's car allotment until it stopped discounting—also are merely unilateral actions, and fail to show any price-fixing agreement.

The only other evidence the plaintiffs advert in support of their claim is a letter sent to defendant by an employee of another Volkswagen dealer, Amerling Volkswagen, which is owned by plaintiff Donald Amerling's father, Murray Amerling. The letter complained about a discount sale Empire Volkswagen had made. While such complaints alone do not support the existence of an agreement, plaintiffs argue that this letter, in conjunction with other evidence, proves the existence of an agreement. First, World-Wide threatened to retaliate against dealers if they discounted, a threat of which all dealers were aware. Second, Murray Amerling stated he had his employee write the letter to "get Donald [Amerling] to get back in the horn." M. Amerling Dep. at 662. Third, World-Wide's response to the letter was to investigate the sale and analyze how much profit Empire Volkswagen was losing by failing to sell at suggested retail prices.

---

**1.** The Court is aware that this statement is hearsay, but assumes its truth for the purposes of this motion.

This evidence, taken as a whole, fails to prove the existence of any agreement between World-Wide and the dealer to set prices. The letter from Amerling Volkswagen does not refer to any agreement. It does not accuse Empire Volkswagen of acting against an agreement Amerling Volkswagen had with World-Wide not to discount retail prices; it just asks for sales advice. Murray Amerling's statement, when viewed in the context of his deposition, merely indicated that it was difficult to compete with a dealer selling cars at less than cost. It was not an agreement not to discount. Finally, defendant's analysis did not refer to a price maintenance agreement that Empire Volkswagen was undercutting. Rather, it merely stated Volkswagen was losing profits. In conclusion, defendant's motion for summary judgment on plaintiff's price fixing claim is granted.

### C. *Group Boycott*

 Plaintiffs also claim defendant's actions constituted a group boycott in violation of 15 U.S.C. § 1. In order to make out a claim for a group boycott under Section 1 of the Sherman Act, the plaintiffs must first show the existence of concerted action. *See United States v. General Motors Corp.*, 384 U.S. 127, 139–45, 86 S.Ct. 1321, 1327–30, 16 L.Ed.2d 415 (1966). In *General Motors*, the Court found "a classic conspiracy in restraint of trade: joint collaborative action by the dealers, the appellee associations, and General Motors to eliminate a class of competitors ..." *Id.* at 140, 86 S.Ct. at 1327. In tne present case, there is no evidence that World-Wide participated in any arrangement with other dealers, explicit or otherwise, to force Empire Volkswagen to adhere to its pricing and sales policies. The only evidence of such an agreement was described in Section I.B. *supra*, and does not establish the existence of joint activity. Defendant's motion for

summary judgment on plaintiffs' claim of an illegal group boycott is thus granted.

### D. *Plaintiffs' Standing to Raise the Antitrust Claims*

Since defendant has been granted summary judgment on plaintiffs' federal antitrust claims, the Court need not consider defendant's claim that plaintiffs Amerling, Susanne Properties, and Empire City lack standing to sue.

## II. *Federal Automobile Dealers' Day in Court Act Claims*

### A. *The Application of the Act to World-Wide Volkswagen*

The Automobile Dealers' Day in Court Act, 15 U.S.C. § 1222, ("ADDA"), provides an automobile dealer with a cause of action against an automobile manufacturer who fails to act in good faith in performing or complying with the terms of an automobile dealership franchise or in terminating the franchise with the dealer. The definition of "automobile manufacturer" includes a corporation engaged in the manufacturing or selling of cars, including any corporation which acts for and is under the control of a manufacturer in connection with distributing its cars. 15 U.S.C. § 1221(c). World-Wide claims it is neither a manufacturer nor under the control of one, and hence is not subject to liability under the Act.

The courts are in conflict over what the Act requires to establish "control." The Ninth Circuit has held that the distributor and manufacturer must be related to each other as an agent and principal in order to establish the requisite control. *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 65–66 (9th Cir.1973).[2] At least two other district courts have held that an agency relationship is not necessary to bring a distributor within the Act. *Grappone, Inc. v. Subaru*, 403 F.Supp. 123, 136–37 (D.N.

---

**2.** In *Martin Motor Sales, Inc. v. Saab-Scania of America*, 452 F.Supp. 1047, 1051 (S.D.N.Y.1978), *aff'd*, 595 F.2d 1209 (2d Cir.1979), the district court held that defendant, a Saab distributor and wholly owned subsidiary of manufacturer Saab-Sweden, was the manufacturer's agent and

thus suable under the Automobile Dealers Act. The Court, however, did not consider the issue of whether or not a relationship weaker than an agency relationship with a manufacturer would suffice to bring a distributor within the Act.

H.1975); *DeCantis v. Mid-Atlantic Toyota Distributors, Inc.*, 371 F.Supp. 1238, 1244 (E.D.Va.1974). Rather, if the manufacturer has the power to direct the course of dealing between a distributor and its retail dealers, the requisite control is established. *DeCantis*, 371 F.Supp. at 1244; *see Grappone*, 403 F.Supp. at 135 (control established when distributor is an intermediary body through which the will of the manufacturer is imposed on dealers).

The Court is persuaded by the latter line of authority. The thrust of the ADDA is to prevent automobile manufacturers from exerting their economic advantage over dealers by forcing dealers to adhere to unfair and inequitable requirements. The Act attempts to balance the power of dealers and manufacturers by giving dealers a cause of action against manufacturers, or those under their control, who made wrongful demands on dealers. *See Woodard v. General Motors Corporation*, 298 F.2d 121, 127 (5th Cir.1962). A strict agency oriented definition of "control" would undercut the Act, and allow both distributors and manufacturers to avoid liability under the ADDA while allowing manufacturers to impose unfair demands on dealers. Manufacturers could set up a network of independently owned distributors who were required, pursuant to the terms of the distributorship agreement, to impose wrongful demands on the dealer. Under such a system, a distributor would not be liable because it was not a manufacturer's agent, and a manufacturer would avoid liability because it was not a party to the franchise agreement. To allow a distributor and manufacturer to bypass the strictures of the Act because the distributor is independently owned would undermine the Act's purpose if the manufacturer controlled the distributor's relations with the dealers. Thus, as the Court in *Grappone, supra,* held, as long as the manufacturer controls the terms the distributor imposes on the dealer, the distributor can be held liable under the Act. 403 F.2d at 136.

Based on the proper standard of control, summary judgment for defendant is not appropriate. While the plaintiffs admit that World-Wide is an independently owned automobile distributor, they assert that it is nevertheless under the control of Volkswagen of America ("VWOA"), which manufactures Volkswagens in the United States. The terms of the distributorship agreement between World-Wide and VWOA indicate that unresolved factual issues regarding the extent of control VWOA exerts over World-Wide and World-Wide's dealers still remain.

For example, the agreement prohibits World-Wide from changing beneficial ownership or executive officers without VWOA's prior consent. More importantly, VWOA retains a significant amount of control over dealers through the agreement. VWOA must approve both the initial appointment of dealers and dealership agreements. World-Wide must approve all changes in the structure and location of dealers' showrooms, and all sales of dealerships. World-Wide, in turn, cannot grant such approvals without the prior written consent of VWOA. World-Wide also must pass to dealers any suggestions VWOA has for them. World-Wide must forward these suggestions in its own name, without changes in substance, and must require the dealers to consider suggestions. World-Wide must also maintain schools for its dealers which comply with VWOA's standards. World-Wide must implement specific rules regarding dealers' operating hours, facilities, and personnel. Numerous other aspects of a dealer's business are to be supervised by World-Wide pursuant to its agreement with VWOA. These include used car sales, advertising, and design of salesrooms. In light of this, summary judgment for defendant on the ground that World-Wide is not a manufacturer within the meaning of the ADDA is not appropriate, and is denied.

B. *World-Wide's Liability under the Act*

In order to be liable under the ADDA, a manufacturer must fail "to act in

good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer ..." 15 U.S.C. § 1222. The term "good faith" in the ADDA has a specific, narrow meaning, and is not to be construed liberally. *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1038 (5th Cir.) *cert. den.*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. den.*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978).

■■■■ In order to lack good faith, a manufacturer must exercise coercion and intimidation and make threats against the dealer. *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 561 (2d Cir.1970). Assessing whether or not an action is coercive requires consideration of all the circumstances of a case. *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 445 (9th Cir. 1979). Coercion and intimidation are shown when the manufacturer makes a wrongful demand on the dealer, *H.C. Blackwell Co., Inc. v. Kenworth Truck Co.*, 620 F.2d 104, 107 (5th Cir.1980) and then threatens to or does impose sanctions for failure to adhere to the demands. *Marquis v. Chrysler Corp.*, 577 F.2d 624, 633, (9th Cir.1978); *Autohaus Bruger*, 567 F.2d at 911. There thus must be a causal connection between the wrongful demand and the sanctions or threatened sanctions. *Autowest*, 434 F.2d at 561.

In the instant case, plaintiffs have alleged essentially three wrongful demands by defendant: that plaintiffs cease selling Fords from the Volkswagen showroom, that plaintiffs sell Volkswagens at the defendant's suggested retail price, and that plaintiffs construct a separate facility from which to sell Porsche and Audi automobiles. Plaintiffs have alleged that as a result of their failure to adhere to these demands, defendant withheld automobiles from them. Plaintiffs also allege that defendant acted in bad faith in terminating Empire Volkswagen's dealership, since the termination resulted from defendant's dis-

satisfaction with plaintiffs' failure to heed their demands.

■■■■ Under the ADDA, in the proper circumstances, a manufacturer's demand that a dealer adhere to its retail price suggestions is a wrongful demand. *Randy's Studebaker Sales, Inc. v. Nissan Motors Corp.*, 533 F.2d 510, 516 (10th Cir.1976); *Autowest*, 434 F.2d at 561. Curtailment of automobile shipments as a penalty for failure to adhere to such demands is an impermissible sanction. *Randy's Studebaker*, 533 F.2d at 516. There are disputed issues of fact as to whether, in fact, defendant made such demands upon plaintiff, and whether defendant curtailed car shipments to plaintiffs due to their failure to adhere to the demand.

■■■ The parties agree that when plaintiffs signed the franchise agreement with defendant, they agreed to construct a separate facility from which to sell Porsche-Audi automobiles. Defendant's attempt to enforce such a contractual provision would generally not constitute a wrongful demand. *Milos v. Ford Motor Co.*, 317 F.2d 712, 716–17 (3rd Cir.1963). Plaintiffs raise numerous factual issues, however, regarding whether the defendant attempted to impose this agreement in bad faith. They claim that defendant assured them that the agreement was only a matter of form and that defendant would not enforce it, and that defendant attempted to enforce the agreement only after plaintiffs began discounting, as a means of forcing plaintiffs to cease discounting.

■■■ The defendant's demand that plaintiffs cease selling Ford automobiles from the Volkswagen showroom, assumed true for the purposes of the ADDA claim, was not wrongful, given the circumstances of the case. While Congress was concerned in the ADDA with a dealer's right to sell automobiles of other manufacturers, *Rea v. Ford Motor Co.*, 497 F.2d 577, 585 (3rd Cir.1974), defendant in this case was reasonable. Defendant did not demand that plaintiffs cease selling Fords altogether, but rather that they stop selling them from

the same showroom as Volkswagens. Further, the Court finds that there is no genuine issue of fact that Fords and Volkswagens were competitive lines of cars, and that plaintiffs' showroom was not large enough to accommodate sales of both lines of cars. In light of the combination of these factors, defendant's demand that plaintiffs cease selling Fords from the Volkswagen showroom was reasonable.

The basis of plaintiffs' wrongful termination complaint is that defendant wrongfully ceased dealing with Donald Amerling as the principal dealer of Empire Volkswagen, and, following a stock transfer through which Murray Amerling received a majority share in Empire Volkswagen, dealt with Murray Amerling alone. Defendant's action in ignoring Donald Amerling eventually led to the termination of plaintiffs' dealership. Plaintiffs raise questions of fact as to defendant's good faith in ceasing to deal with Donald Amerling. The primary factual issue they raise is whether defendant followed its own procedures, dictated in its agreement with VWOA, in removing Donald Amerling as principal dealer. This, coupled with World-Wide's disagreement with Amerling over pricing policies, raises the issue of whether defendant was unreasonably anxious to rid itself of Donald Amerling.

In summary, plaintiffs have raised material issues of fact as to whether defendant acted in good faith under the terms of the ADDA, and defendant's motion is denied except as to defendant's demand that plaintiffs cease selling Ford automobiles. On that issue, summary judgment is granted as the demand was not wrongful as a matter of law.

### C. *Plaintiffs' Standing To Sue*

Under the ADDA, only automobile dealers have standing to bring a suit against automobile manufacturers. 15 U.S.C. § 1522. The term "automobile dealer" is defined as any person, partnership, corporation, or association operating under the terms of a franchise and engaged in the distribution of passenger cars. 15 U.S.C. § 1221(c). Defendant argues that plaintiffs Empire City, Susanne Properties, and Donald Amerling do not have standing to bring an action under the ADDA because they are not automobile dealers.

Under the ADDA, when an automobile "dealership is doing business in the corporate form and where the corporation is the party to the franchise agreement, Section 1221(c) dictates that the 'locus of the right of action is the corporation'." *Olson Motor Co. v. General Motors Corp.*, 703 F.2d 284 (8th Cir.), *quoting Vincel v. White Motor Corp.*, 521 F.2d 1113, 1120 (2d Cir.1975) *cert. den.*, 464 U.S. 894, 104 S.Ct. 240, 78 L.Ed.2d 231 (1983). Thus, only the corporation has standing to bring a claim under the ADDA. The only exceptions to this standing rule are that when the corporation cannot sue, *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710 (7th Cir.1965), or, when the franchise agreement was conditioned on the individual dealer's participation in the dealership, *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir.1971), an individual dealer may sue the manufacturer.

Under these principles, neither Susanne Properties nor Empire City have standing to sue. Neither corporation is a party to the franchise agreement with World-Wide. Plaintiff Donald Amerling does not have standing to sue either. The record shows without dispute only that he was the majority shareholder and that his ownership could not be transferred without the distributor's approval. This sort of reliance on Amerling's participation does not rise to the level of reliance required in *York, supra.* Nor is Empire Volkswagen unable to pursue this litigation in the same way as the corporation in *Kavanaugh, supra,* was unable to sue. Thus, only Empire Volkswagen may bring this action under the ADDA.

### III. *State Law Claims*

#### A. *New York State Automobile Dealers Act*

New York General Business Law § 197 prohibits an automobile manufactur-

er or distributor from terminating any contract or franchise to sell new motor vehicles "except for cause." N.Y.Gen. Bus.Law § 197. The purpose of this act is to provide judicial relief to small motor vehicle dealers from unfair and inequitable practices. *Two Wheel Corp. v. American Honda Corp.*, 506 F.Supp. 806, 816 (E.D. N.Y.) *aff'd*, 633 F.2d 206 (2d Cir.1980). Thus, "principles of fundamental fairness must guide application of § 197 to the facts of this case." *Id.* Based on the facts in dispute as described in Section II., *supra,* fundamental fairness requires that plaintiffs be allowed to raise this claim at trial.

Plaintiffs' claim under N.Y.Gen.Bus. § 198 must be dismissed. Section 198 allows a court, during the pendency of an action brought pursuant to Section 197, to enjoin a distributor not to terminate the franchise in question. The record indicates that plaintiffs' dealership was terminated before the commencement of this action, rendering such relief impossible.

### B. *New York State Antitrust Law*

Plaintiffs contend that defendant's actions also violated New York State's antitrust law, N.Y.Gen.Bus.Law § 340. Section 340, however, prohibits only a "contract, agreement, arrangement, or combination" which restrains trade. *Id.* at 1. Since the Court has already found in Section I., *supra,* that there was no such agreement to restrain trade, plaintiffs' claim under Section 340 is dismissed.

### C. *Intentional Interference With Contractual Relationships*

■ Plaintiffs claim that defendant's action constituted wrongful interference with the contractual relationships existing between Empire City and Ford Motor Company. Plaintiffs also claim World-Wide interfered with the contractual relationship among Empire Volkswagen, Empire Porsche Audi, and Empire City on the one hand, and Susanne Properties and Donald Amerling on the other hand. To succeed on a claim of wrongful interference, plaintiffs must show that World-Wide intention-

ally interfered with plaintiffs' contractual relations. *Navarro v. Fiorita*, 271 A.D. 62, 66, 62 N.Y.S.2d 730, 733 (1st Dep't. 1946), *aff'd,* 296 N.Y. 783, 71 N.E.2d 468 (1947). As described in Section II., *supra,* there is a factual dispute as to World-Wide's intentions in dealing with plaintiffs. Defendant's summary judgment motion on this claim is thus denied.

### D. *Breach of Contract*

■ Plaintiffs Empire Volkswagen, Empire Porsche Audi, and Donald Amerling allege defendant breached its contractual agreement with them. Defendant alleges that only Empire Volkswagen was a party to the agreement and thus only it can bring a claim for breach of contract. There is no issue that the dealership agreement is between Empire Volkswagen and World-Wide Volkswagen. Nor is there any allegation that Amerling or Empire Porsche Audi is a third-party beneficiary to this contract. Thus, defendant's motion for summary judgment as to Amerling's and Empire Porsche Audi's breach of contract claim is granted.

### IV. *Defendant's Counterclaims*

■ Defendant brought two counterclaims against plaintiffs, alleging they failed to pay for supplies World-Wide delivered to them, and now move for summary judgment on these counterclaims. Given the Court's finding that there are material facts at issue as to defendant's good faith in dealing with the plaintiffs, there is some question as to defendant's responsibility for plaintiff's alleged failure to pay. Summary judgment is thus denied.

SO ORDERED.