**SUBARU DISTRIBUTORS CORP., Plaintiff,**

v.

**SUBARU OF AMERICA, INC., Defendant.**

No. 98 Civ. 5566(CM).

United States District Court, S.D. New York.

April 5, 1999.

Dale A. Schreiber, Proskauer, Rose, Goetz & Mendelsohn, LLP, New York City, for Subaru Distributors Corp., plaintiff.

Lewis A. Noonberg, Piper & Marbury, Washington, DC, for Subaru of America, Inc., defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING PARTIAL SUMMARY JUDGEMENT TO THE DEFENDANT

McMAHON, District Judge.

Underlying this application for a preliminary injunction is a dispute between Subaru Distributors Corporation ("SDC") and Subaru of America, Inc. ("SOA") over cer--

tain terms of the parties' Distributor Agreement (the "DA" or "Agreement"), entered into in January 1975. SDC is the exclusive wholesale distributor of Subaru vehicles for New York and northern New Jersey. SOA is the exclusive United States importer and national distributor of Subaru vehicles. SDC believes that SOA is about to terminate its distributorship. It therefore asks this Court to intervene.

The matter comes before the Court in an unusual posture. Ordinarily, an automobile franchisee comes to court after receiving a notice of termination (which, under New York's Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law § 463(d)(1), must provide the franchisee with 90 days notice). The franchisee seeks a declaration that the noticed termination is wrongful and an injunction preventing the franchisor from exercising its power to terminate on the basis asserted. The court decides whether the termination is consonant with the parties' contractual rights. If it is, the application for a preliminary injunction is denied; if not, the application is granted.

Here, there has been no notice of termination. Instead, SOA, the franchisor, has repeatedly threatened to terminate the franchise of SDC, one of its distributors. Under the DA, every time SDC orders its monthly quota of cars from SOA, it is required to post a domestic irrevocable letter of credit ("LC") on terms "acceptable to [SOA]." (DA, Section 7(3).) In recent months, SOA has demanded that, to be "acceptable," SDC's letters of credit must: (1) expressly permit SOA to make partial draw downs based on partial shipments of SDC's total order; (2) be payable to SOA upon issuance in an amount sufficient to cover the full cost of the cars ordered; (3) expire no sooner than the end of the fourth month after the month in which the relevant purchase order was submitted; (4) be transferable; (5) con-

tain no term that assesses transfer charges to SOA; (6) contain no language that prevents draw down unless SOA delivers precisely the models and colors of cars ordered by SDC or that requires SDC's inspection of the vehicles as a condition precedent to draw down; (7) be payable on presentation of documents to SDC's bank, without delivery of documents to SDC or approval of draw downs by SDC; and (8) be issued by a bank acceptable to SOA (such as The Chase Manhattan Bank, which for some years has provided SDC with its financing). *See* July 28, 1998 Letter of Lewis A. Noonberg to Dale A. Schreiber, as amended (the "Noonberg Letter"), attached as Exh. 10 to Plaintiff's Memorandum in Support of Its Application For A Temporary Restraining Order, Preliminary Injunction and Partial Summary Judgment ("Pl.'s Br.").[1]

SDC comes before this Court seeking an injunction that would require SOA to accept a letter of credit from SDC in a form *acceptable to SDC.* Such a letter of credit, needless to say, differs radically from the form of a letter of credit *acceptable to SOA.* Most significantly, SDC wants SOA to accept a letter of credit with terms: (1) ensuring that SDC has the right to inspect delivered vehicles prior to any draw down on the letters of credit, to verify that deliveries match the model codes and colors of cars ordered by SDC; (2) requiring SOA, before draw down, to deliver a written notice to SDC stating the vehicle identification number (VIN) or vehicle order number (VON) for each vehicle ordered and a commercial invoice identifying each vehicle by model code, color and price; (3) requiring SOA to present to SDC's bank, as draw down documents, vehicle title certificates, a bill of sale conveying title to each vehicle and commercial invoices identifying all vehicles by model code, color and price; (4) prohibiting the draw down of any letter

---

**1.** SOA's demands one, two, four and eight are not matters of controversy between the par-

ties and will not be discussed in this opinion.

of credit until the first day of the second month following its posting (i.e., if the letter of credit is posted in January, it cannot be drawn down until March 1) and providing that each letter of credit will automatically expire at the end of the second month following its posting (i.e., if posted in January, then expiring at the end of the day on March 31); and (5) allowing SDC to charge SOA for any costs SDC incurs if SOA transfers its rights as beneficiary under a letter of credit.

In the alternative, SDC asserts that SOA should be enjoined from insisting on the LC terms proposed in the Noonberg Letter, and from terminating SDC's franchise if it refuses to include such terms in the letters of credit it posts, because SOA's proposed terms conflict with the requirements of the DA.

The parties are also fighting about most of the other aspects of their mutually profitable but always acrimonious relationship. As long as it is here, SDC also asks the Court to enjoin SOA from doing a number of other things, including:

(1) compelling SDC to accept delivery of, or pay for, any vehicle that does not conform to SDC's accepted monthly quota purchase order;

(2) demanding that SDC submit its next purchase order before the oldest outstanding letter of credit in favor of SOA has either been completely drawn down or has expired by its terms;

(3) refusing to accept or reject an SDC purchase order later than four days before the date on which SDC must submit its next quota purchase order; and

(4) demanding that SDC order any cars under its annual quota during the months of October, November and December each year, or prior to the later of January 7 of the following year or the date upon which any quota for the subsequent calendar year has been determined.

SDC also prays for an injunction that would prevent SOA from actually terminating SDC's exclusive distributorship based on SDC's failure to comply with any of the above letter of credit or other demands. Finally, SDC seeks partial summary judgment declaring that it is not required to order vehicles during the fourth quarter of each calendar year.

What has happened here is quite clear. After dealing with each other for 24 years, under a contract that provides for an exclusive franchise in perpetuity, SDC and SOA are at loggerheads over almost every aspect of their relationship. The DA—which both sides agree was inartfully drawn many years ago in contemplation of a much simpler commercial relationship—has very little to do with how the parties have done business for the better part of two decades. However, as relations have deteriorated, SDC has begun to insist that the parties conduct their affairs by the letter of the DA (and, perhaps, by some letters that do not actually appear in the DA). This has led SOA to advance its own, utterly inconsistent reading of the relevant provisions of the DA—many of which the parties prudently jettisoned fifteen or twenty years ago.

The result is predictable: in a situation where a mutually rewarding commercial relationship demands a certain amount of "wiggle room," the parties have come to this Court and in effect asked that I explain to them the legal parameters of their relationship. Both sides have been warned that this course might well eliminate the "wiggle room" that has allowed them to deal with each other for the past two decades against the backdrop of an admittedly inadequate and out-of-date contract. Regrettably, neither side has blinked. Therefore, it appears that I must rule on SDC's application for a preliminary injunction.

### Background

1. *The DA*

SOA, a New Jersey corporation, is a wholly-owned subsidiary of Fuji Heavy Industries Ltd. of Japan, the manufacturer

of Subaru automotive products. SOA is the exclusive United States importer and national distributor for Subaru. For many years, it conducted its affairs by maintaining franchise agreements with a group of thirteen regionally-based distributors. These agreements offered each regional distributor an exclusive franchise in perpetuity, assuming the franchisee complied with the terms of its Distributor Agreement. At present, there are only two remaining regional distributorships, SOA having taken over the rest.[2]

In January 1975, SOA awarded one of its regional distributorships to Plaintiff SDC, a New York corporation with its principal place of business in Orangeburg, New York. SDC sells Subaru vehicles through a network of 65 authorized retail dealers located throughout the New York and northern New Jersey region.

The DA is the contract between SOA and SDC pursuant to which SDC was licensed to sell Subaru vehicles. It contains the following key terms:

a) The Agreement runs from year to year and is automatically renewed, subject to termination by SOA only for "cause." (DA, Article 12(1).)

b) In each contract year, SDC is required to purchase a minimum number of cars (the "quota"). (DA, Article 7(3).) Exhibit B to the DA, as amended from time to time, sets forth the quota of cars for each year. Each succeeding year's quota is to be negotiated three months prior to the end of the then current calendar year; absent a negotiated agreement, the quota automatically increases by fifteen percent over the prior year's number. (DA, Exh. B.) Over time, and despite the fact that there have been years when no quota was set or enforced, the number of vehicles SDC is required to purchase under the quota has grown from 1,800 to almost 16,000 per year. (*See* DA, Exh. B; *see also*

Transcript of Oral Argument ("Tr."), March 11, 1999, at 2.)

c) Each quota order placed by SDC must be accompanied by a domestic irrevocable letter of credit "acceptable to [SOA], in favor of [SOA]." (DA, Article 7(3).)

d) A bare-bones ordering procedure is specified in the contract. (DA, Article 7(3).) Simultaneous with the execution of the DA, SDC placed an order for ¼ of the first year's quota of cars—with ⅛ of that order being due for delivery in each of the first three months of the initial contract year. (*See* Affidavit of Robert T. Butler, attached to Pl.'s Br., at ¶ 20.) The DA provides that, thereafter, "within seven days after each letter of credit becomes an acceptance [SDC] shall order for the next month of the contract year an additional ¹⁄₁₂ of the annual minimum requirement as set forth in Exhibit 'B' hereof. This order shall be accompanied by a domestic, irrevocable letter of credit in favor of [SOA]. This procedure shall continue throughout the contract year." (DA, Article 7(3).)

e) SOA retains the right to accept or reject SDC's orders, in whole or in part. Acceptances are valid only if made in writing to SDC. However, SDC is bound by its order unless it is rejected in writing, or until an order is only partially accepted—in which case, the rest of the order is no longer binding on SDC. (DA, Article 9(2).)

f) Delivery of the cars is to be made at a U.S. port of call chosen by SDC (currently the Port of Boston). (DA, Article 9(6), as amended.)

g) Title to the cars initially passed from SOA to SDC when the cars were invoiced; in 1981, the DA was amended to provide that title passed upon invoicing *and payment.* (DA, Article 9(5), as amended by Letter from Robert T. Butler and Robert L. Reich, dated September 18, 1981 ("1981 Letter Agreement"),

---

**2.** SDC sees a nefarious plot in the works by SOA and Fuji to eliminate all the distributorships, and this, of course, colors its view of every communication from SOA.

attached as Exh. 22 to Pl.'s Br.). Regardless of who held title, SOA retained the risk of loss during transit. (DA, Article 9(7).)

h) SDC retains the right to place additional orders over and above the quota, and SOA has the right to accept or reject such orders. (DA, Article 9(4).)

Pursuant to the choice of law clause in Article 15(12), the DA is governed by the law of Pennsylvania. Like New York, Pennsylvania has adopted the Uniform Commercial Code (the "UCC"). Where appropriate, I shall invoke its terms to give meaning to particular provisions of the DA.

### 2. *Early Dealings Between the Parties*

Adherence to the literal terms of the DA stopped early on in the parties' relationship, particularly with regard to the terms of payment. In the first few years of their arrangement, SDC accompanied each of its monthly purchase orders with a documentary letter of credit, upon which SOA drew to receive payment for the vehicles delivered. (*See* Declaration of Joseph T. Scharff ("Scharff Decl."), attached to Defendant's Memorandum in Opposition To Plaintiff's Application For A Temporary Restraining Order, Preliminary Injunction and Partial Summary Judgment ("Def.'s Br."), at ¶ 4.) This system worked relatively well as long as SOA was delivering cars to SDC once a month in lots that closely matched a single purchase order. However, by 1977, as the pace of sales to SDC increased, the documentary LC system proved to be administratively unwieldy. *See* Scharff Decl., at ¶ 4. All the cars in a purchase order could no longer be delivered in a single lot. This meant that SOA was making multiple drawdowns on the documentary letters of credit, which increased its transaction costs.

After several years of negotiations, SOA and SDC agreed in 1981 to modify their procedure for payment. Instead of using documentary LCs as the medium of payment, SDC paid cash for the vehicles. As security, SDC posted three standby letters of credit with extended expiry dates covering, in total, three months worth of purchases. To conform to the new payment system, the parties amended the DA to provide that title to the cars would pass upon payment, not simply upon tender of an invoice. (*See* 1981 Letter Agreement, attached as Exh. 22 to Pl.'s Br.)

In 1990, there was a further modification to the payment system. To keep fees and capital requirements down, SOA and SDC arranged that the three LCs posted by SDC would be documentary, rather than standby, letters of credit, however SDC would continue to pay for the cars in cash. A few times per year, SDC and its (then) bank would arrange for SOA to "draw down" on the letters of credit, in order to satisfy bank regulators that the letters were in fact documentary LCs. After draw down, an LC would then be reinstated in its full amount. Thus, the parties arranged a system whereby documentary letters of credit were made to function as standby letters of credit. They have operated under that system ever since.

There were other discrepancies between the literal terms of the DA and the parties' business routine as well. As a matter of practice, SDC has routinely placed an order for $\frac{1}{12}$ of its annual quota by the seventh day of each month, rather than seven days after anything relating to its letters of credit. Additionally, while the DA prescribes a simple purchase order submission and acceptance process, the parties have engaged, as a matter of course, in various stages of "dickering" over what vehicles were going to be delivered under each purchase order, treating SDC's initial purchase order as a "wish list" that was modified via negotiation so SOA could fairly allocate its most (and least) desirable models and features to dealers throughout the country. (*See, e.g.,* Declaration of Gerald Lee ("Lee Decl."), attached to Def.'s Br., at ¶ 11; Tr., at 29–30 (argument of Plaintiff's counsel)). There is no allegation in this action that SOA has deprived SDC

of the more desirable Subaru cars; to the contrary, SOA and SDC amended the DA in 1990 to permit SDC to purchase the popular Legacy vehicles manufactured by Subaru Isuzu Automotive, Inc. ("SIA") in Indiana. (*See* Memorandum of Understanding, dated September 14, 1990 ("MU"), attached as Exh. 55 to Pl.'s Br.)

### 3. *Disputes Over the Payment System*

The parties have put radically different spins on how their dispute over the terms of payment came into being and grew into the all but impossible situation facing them today. From SDC's vantage point, SOA has been trying for many years to force it into default so its exclusive franchise could be terminated; to support its assertion, SDC points, not unpersuasively, to the fact that numerous other SOA distributors have been terminated over the last fifteen years. As far as SOA is concerned, SDC is biting the hand that fed it during the decade when Subaru sales were down and SDC likely would have gone under without relief from its quota obligation. Whatever the truth of the matter, one thing is clear: in the mid–1990s, after a serious downturn in the market for Subaru vehicles, there was a turnaround. SDC, which had operated without a quota (or without the quota being enforced) during the lean years, began ordering significantly more cars. This, of course, dramatically changed the economics of paying in cash while posting letters of credit as security. In 1996, SDC objected to the fact that the cash payment/pseudo-standby LC system the parties were operating under was causing it financial hardship, and SDC indicated that it intended to revert to the payment system written into the contract—i.e., use of documentary letters of credit to pay for vehicles ordered. It sent a proposed form of documentary letter of credit for SOA's consideration in June 1996.

The parties negotiated for almost two years without coming to any agreement about how to do business in the future. SDC insisted that the parties follow the precise (or, more accurately, the not-so-precise) terms of the DA; SOA argued that it was not obligated to accept documentary letters of credit as payment in light of over one and a half decades of contrary practice. Finally, SOA served a letter on SDC (the Noonberg Letter, attached as Exh. 92 to Pl.'s Br.), in which it agreed to accept payment by documentary letter of credit, but set forth terms for an "acceptable" letter of credit that were—predictably—unacceptable to SDC. SOA announced that, effective November 1, 1998, it would enforce its demand that SDC provide such a letter of credit with each new order if it chose not to pay for cars in cash. SDC brought this action, and negotiations continued.

### 4. *The Instant Action*

SDC filed its Complaint in this action on August 5, 1998, seeking "to resolve disputes between the parties arising under SDC's distributorship agreement. . . ." SDC brought claims for breach of contract and for violations of the New York Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law, § 461 *et seq.* (the "New York Dealer Act" or "Dealer Act"), and the Federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* (the "Federal Dealer Act"). In the Complaint, SDC alleged that SOA—through repeated demands that SDC sign amendments to the DA—has attempted to deprive SDC of its rights and benefits under provisions of the DA concerning such things as vehicle ordering and delivery, posting of letters of credit, and negotiation of SDC's annual quota. SDC also claimed that SOA intends to use its demands in the Noonberg Letter as a pretext to terminate the DA upon SDC's failure to comply. Furthermore, SDC contends that SOA's implicit threats of termination violate both the New York Dealer Act and the Federal Dealer Act, in that they constitute coercion and failure to act in good faith as defined by those

Acts.[3] SDC seeks declaratory, injunctive and other relief against SOA.

When an additional six months of negotiations over acceptable terms of a documentary letter of credit proved unavailing, SDC brought on a motion for a preliminary injunction by order to show cause. At the time the motion was brought, SDC represented to the Court that its current bank, The Chase Manhattan Bank, had concerns over increasing SDC's line of credit in order to issue a letter of credit in the form demanded by SOA, but would do so pending a court test of the legality of SOA's demands. When faced with the inevitable argument that SDC would suffer no irreparable injury in light of Chase's willingness to continue financing SDC, the Bank changed its tune, at least to the extent of saying that: (1) Implementation

3. SOA argues that the New York Dealer Act is not applicable to it because the parties entered into the DA in 1975, nine years before the Dealer Act became law in 1984. While SOA is correct that, as a general matter, the Dealer Act may not be applied retroactively, *see Sound Move Autoplaza, Inc. v. Nissan Motor Co.*, No. 87 Civ.1938, 1989 WL 50797, at *8 (E.D.N.Y. May 8, 1989), I find that the parties have materially amended the DA subsequent to the July 1984 passage of the Act.

When deciding whether an amendment has been material so as to bring a franchise agreement under the Dealer Act, the key inquiry is whether the obligations of the parties remain the same as they were originally, or whether there has been a significant or material alteration of the relationship. *See, e.g., Anthony Distrib., Inc. v. Miller Brewing Co.*, 917 F.Supp. 791 (M.D. Florida 1996); *West Shore Equip. of Milwaukee, Inc. v. New Holland Inc.*, 685 F.Supp. 1090 (E.D.Wis.1988); *E.A Dickinson & Assocs., Inc. v. Simpson Elec. Co.*, 509 F.Supp. 1241 (E.D.Wis.1981). SDC argues that the parties materially amended the DA in three ways, post–1984: (1) through periodic quota amendments, (2) by letter agreements in which SOA approved SDC management changes, and (3) through the 1990 Memorandum of Understanding that allowed SDC to purchase cars manufactured in Indiana by SIA.

I find that the quota amendments and the management change agreements do not constitute material amendments of the DA because both involved changes that were clearly contemplated by the parties at the time they entered into the DA. (*See* DA, Exh. B (explicitly stating that the annual quota will be renegotiated each year after the fifth year of the distributorship); Article 5(3) (providing the procedure for making changes in ownership or management of distributorship).) However, I find that the 1990 MU *did* constitute a material change in the parties' relationship and obligations that was not contemplated at the time they entered into the DA in 1975. At the time the parties were negotiating the MU, SOA maintained that it was *not required to* provide any SIA vehicles to SDC under the DA, allegedly withheld such vehicles from SDC for several months, and demanded the making of a formal amendment to the DA. While the MU appears on its face only to clarify the terms of the DA, the course of negotiations between the parties indicates that the MU put into effect either a "new" contractual right or one that SOA had previously refused to acknowledge. Therefore, I find that the DA was materially amended in 1990 and that there is no retroactivity problem with applying the Dealer Act to this distributorship.

SOA also claims that application of the New York Dealer Act to it would exceed the New York State Legislature's power, since the rights and obligations under the DA involve commerce occurring in other states. But there is no extraterritoriality problem with application of the Dealer Act to these parties. The Act regulates evenhandedly (i.e., does not discriminate against out-of-state parties) to effectuate a legitimate local public interest. Its effects on interstate commerce are only incidental. And the incidental burden imposed on interstate commerce is not excessive in relation to the local benefits of the Act. *See, e.g., Mon–Shore Management, Inc. v. Family Media, Inc.*, 584 F.Supp. 186, 188–91 (S.D.N.Y.1984). The Dealer Act contains explicit geographical limitations that are designed to regulate only franchises where the franchisee *does business or intends to do business within the state of New York.* The New York Legislature's findings indicate that the regulations were adopted because "the distribution and sale of motor vehicles within this state vitally affects the general economy of the state and ... is necessary to regulate motor vehicle manufacturers [and] distributors ... and to regulate dealers of motor vehicles *doing business in this state* in order to prevent frauds, impositions and other abuses...." *See* N.Y.Veh. & Traf.Law § 460 (emphasis added). SOA clearly does business in New York, and SDC is located here. Thus, the Dealer Act is a legitimate exercise of New York's police power and can constitutionally be applied to distributors and franchisors—like SDC and SOA—that do business in this state.

of SOA's demands would "necessitate a substantial review of SDC's credit facility by Chase ... [and][t]his review would create uncertainty concerning the willingness of Chase to continue to provide SDC with its required credit facility." (Affidavit of Peter M. Killea ("Killea Aff."), attached in support of Plaintiff's Reply Memorandum In Support of Its Application For A Temporary Restraining Order, Preliminary Injunction and Partial Summary Judgment, at ¶ 21.); (2) "Chase has *not* committed or given any assurance that it will increase [SDC's] credit limit." (Killea Aff. at ¶ 22.); (3) "[I]mplementation of SOA's ... demands—or a further deterioration of SDC's relationship with SOA—could cause Chase to refuse to provide letters of credit to SDC." (Killea Aff. at ¶ 23.); and (4) "[I]f SOA were to send [a termination notice], Chase would have to consider immediately terminating all extensions of credit to SDC and calling all outstanding debt...." (Killea Aff., at ¶ 24.) As SDC's counsel summed it up at oral argument, Chase is "taking it day by day." (Tr., at 52.)

SOA stands ready to terminate SDC's distributorship the first time a month passes without SDC ordering its quota of vehicles supported by a letter of credit "acceptable to SOA." And so we find ourselves here.

### Standard for Injunctive Relief

#### 1. *Likelihood of Success on the Merits*

The standard in this Circuit for securing preliminary injunctive relief is well established. The movant carries the heavy burden of showing (1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997); *Tom Doherty Assocs., Inc. v.*

*Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*). The award of a preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the plaintiff has met its burden of proof. *Beech–Nut, Inc. v. Warner–Lambert Co.,* 480 F.2d 801, 803 (2d Cir.1973); *Kraft General Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 127 (S.D.N.Y.1993).

■ Furthermore, when the preliminary injunctive relief sought is deemed mandatory, rather than prohibitory, the Second Circuit has prescribed an even higher standard. *See Tom Doherty Assocs.,* 60 F.3d at 33–34. To obtain mandatory injunctive relief, the plaintiff must show a *clear and substantial* likelihood of success on the merits. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (emphasis added); *see also American Society of Composers, Authors, and Publishers v. Pataki,* No. 95 Civ. 9895(BSJ), 1997 WL 438849, at *3 (S.D.N.Y. Feb.27, 1997). "[A] mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs.,* 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985), rev'd on other grounds).[4]

#### 2. *Irreparable Harm*

■ In addition to the "likelihood of success" requirement, an applicant for a preliminary injunction must demonstrate that it will suffer irreparable harm in the absence of the relief sought. The threat of irreparable harm is a *sine qua non* for the granting of preliminary injunctive relief, *see Buffalo Forge Co. v. Ampco–Pitts-*

---

**4.** While the Second Circuit has required a higher showing for mandatory injunctive relief, it has also cautioned that the distinction between mandatory and prohibitory injunc-

tions is often "more semantical than substantive." *Innovative Health Sys. Inc. v. City of White Plains,* 117 F.3d 37, 43 n. 6 (2d Cir. 1997).

*burgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981); "if there is no irreparable injury, there can be no preliminary injunction." *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F.Supp. 404, 406 (S.D.N.Y.1997).

█ In order to establish irreparable harm, the plaintiff must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989). Additionally, the injury "must be one not capable of being fully remedied by money damages." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995) (citing *Tucker*, 888 F.2d at 975).

## Conclusions of Law

### SDC's Motion for an Injunction Compelling SOA to Accept SDC's Preferred Form of Letter of Credit is Denied.

█ SDC's first request is for a mandatory injunction compelling SOA to accept a documentary letter of credit in the form proposed by SDC.[5] SDC is not entitled to such an injunction because it cannot show that it has a clear or substantial likelihood of success on the merits of its claim that it has a contractual right to dictate the letter of credit terms. Furthermore, even if the lower standard for prohibitory injunctive relief were to apply, SDC could not make the threshold likelihood of success showing. The Distributor Agreement is clear about very few things, but with respect to this particular dispute between the parties, it is crystal clear. The Agreement states that SDC's purchase orders have to be accompanied by irrevocable letters of credit "acceptable to [SOA]." (DA, Article 7(3).) There is no other provision in the DA that discusses or relates to the terms of the letters of credit, and certainly no provision that permits SDC to dictate the terms of its LCs. As long as SOA's terms are commercially reasonable and consonant with the parties' rights and duties under the DA, SDC must post a letter of credit as dictated by SOA.

SDC has argued, with the support of its banking expert, that the phrase "acceptable to [SOA]," as used in Article 7(3), means merely that SOA has the right to approve the issuing bank from which SDC gets the letter of credit, but not the terms of the letter of credit itself. (*See* Affidavit of Sandra S. Stern, attached to Pl.'s Br., at ¶¶ 4(c), 22–23.) I find this argument unpersuasive. If that was what the parties had intended, the DA could easily have read "a letter of credit *from a bank* acceptable to [SOA]." SOA's expert, Dennis Noah, testified by affidavit that "acceptable to [SOA]" as used in Article 7(3) "means not only that SOA must be satisfied with the soundness and credit rating of the bank issuing the LC, but also [with] the feasibility and technical competence of the LC." I find that evidence far more persuasive than the testimony of Ms. Stern. (*See* Affidavit of Dennis L. Noah ("Noah Aff."), attached to Def.'s Br., at ¶¶ 4(a), 10–15.) As Mr. Noah states, while the soundness of the bank is certainly important to a letter of credit beneficiary, the commercial feasibility and technical competence of a letter of credit—document presentation requirements, expiry dates and the like—are at least as important, because it is those details that determine whether the beneficiary will be able to make a complying presentation and receive payment. (*See* Noah Aff., at ¶ 10.) Furthermore, I credit Mr. Noah's statements that LC terms are frequently negotiated and tailored—by beneficiaries and applicants, and by applicants and their banks—

5. This dispute between the parties was presented initially as a battle over whether the DA provided for the use of documentary letters of credit or standby letters of credit. However, since SOA conceded in its Memorandum of Law that the DA contemplated documentary letters of credit, and also conceded that SDC could force a return to the use of such letters of credit as the sole means of payment for vehicles purchased from SOA, the remaining issue is whether SDC can dictate the terms of that documentary letter of credit.

to reflect the underlying transaction and to meet the needs of the parties. (*See* Noah Aff., at ¶¶ 13–14.) Thus, SOA has the right under the DA to have a form of letter of credit which is acceptable to it, as long as that form is commercially reasonable and consistent with the DA.

*SDC's Alternative Motion for an Injunction Prohibiting SOA From Requiring Certain Terms in the Letters of Credit is Denied.*

SDC's alternative request is that this Court enjoin SOA from requiring that SDC provide a letter of credit in the form SOA has demanded through the Noonberg Letter. SDC asserts that, even if the DA gives SOA the right to have a letter of credit acceptable to it, several of the terms SOA has proposed would violate SDC's rights under the Distributor Agreement—either expressly or because they are commercially unreasonable. While I have already noted that the DA says nothing about what *must appear* in the letters of credit, it is possible that SDC could convince a trier of fact that inclusion of certain terms would violate SDC's contractual rights.

The UCC provides for an implied covenant of good faith in the performance or enforcement of all contracts, with "good faith" defined as "honesty in fact in the conduct or transaction concerned." UCC §§ 1–201(19), 1–203; *see also Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991). Furthermore, "the Second Restatement of Contracts provides that good faith performance of a contract 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party' while bad faith 'may be overt or may consist of inaction.... [T]he following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, *abuse of a power to specify terms,* and interference with or failure to cooperate in the other party's performance.'" *Bank of China*, 937 F.2d at 789 (citing Restatement (2d) of Contracts, § 205, comments a, d) (emphasis added).

Thus, in spite of its seemingly unfettered discretion under the DA to require an LC acceptable to it, SOA must act in a commercially reasonable manner when it specifies the "acceptable" terms to be included in an LC. A fairly implied limitation on this discretion is that it may not demand terms that contravene the letter of the DA or the intention of the parties at the time they entered into that contract. *See, e.g., M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) ("[C]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations.") (citing Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 371 (1980)). Accordingly, I analyze each term demanded by SOA and challenged by SDC as violative of the DA or commercially unreasonable to see if SDC is likely to prevail on the merits of that claim. With exceptions that I shall note along the way, SDC's alternative motion is assessed under the standard for prohibitory injunctive relief, and thus SDC must demonstrate a likelihood of success on the merits of its claims that SOA's proposed terms violate the DA.

i. *SDC Is Not Entitled to Injunctive Relief With Respect to Its Claim that SOA May Not Draw Down on the LCs Prior to Delivering a Written Notice to SDC Stating the Specific Models and Colors of Vehicles That Have Been Delivered to SDC in the Port of Boston.* (Claim 2(a)(I)(A) of the Order to Show Cause)

ii. *SDC Is Not Likely To Succeed On Its Claim that SOA May Not Draw Down on the LCs Before SDC Inspects the Vehicles to Determine That They Conform To The Purchase Order* (Claim 2(a)(I)(B) of the Order to Show Cause)

██ SDC's presentation of its arguments in support of these two claims for

injunctive relief is unnecessarily complicated. I am, therefore, taking the liberty of restating them.

At the heart of SDC's argument lies its belief that, under the DA, SOA is required to deliver to SDC precisely the vehicles (in terms of model, color, and various features) that are specified in the purchase orders submitted by SDC. SDC further believes that it cannot be required to pay SOA for any cars until it has adequate assurances that SOA is delivering only cars that conform to SDC's model mix. Everything that SDC seeks to include in or exclude from the LCs that touches on delivery or the timing of payment boils down to a demand that it be allowed to inspect all vehicles tendered for delivery prior to payment, in order to ensure that they conform to its desired model mix. Until one understands that this is SDC's agenda, its various contentions make little sense; once that becomes clear, everything falls into place. After an exhaustive review of the record, I have reached the following conclusions:

First, pursuant to the New York Dealer Act, SDC cannot be compelled to take delivery of vehicles that it did not order and does not want. The New York Dealer Act makes it unlawful "for any franchisor to directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer: (a) To order or accept delivery of any motor vehicle or vehicles ... which shall not have been voluntarily ordered by the ... dealer...." N.Y.Veh. & Traf.Law § 463(1)(a). This Act applies to SOA, as explained in footnote three, above. This does not mean, however, that SDC has a contractual or commercial right either to inspect the vehicles prior to payment or to demand some sort of written notice of a conforming tender as a precondition to payment. In the absence of provisions in the DA that specifically address these is-

sues (and there are none), the Dealer Act and the Uniform Commercial Code govern the parties' rights and more than adequately protect SDC from having unwanted vehicles forced upon it. They also give SDC adequate protection in the event it pays for vehicles that are rejected upon tender as non-conforming. Therefore, SDC has failed to persuade me that it is likely to succeed on the merits of these portions of its application for an injunction, and has also failed to persuade me that it would be irreparably harmed if no injunction were to issue.

Second, SDC is correct that it has the right to dictate the place of delivery of the vehicles. Article 9(6)[6] of the DA explicitly grants SDC the right to choose the port of entry for vehicle deliveries. To the extent that Articles 9(7) and 9(9) of the DA are inconsistent with Article 9(6), the latter controls because it is *the* provision in the Agreement directed specifically to what port of entry will be used. Articles 9(7) and 9(9) deal, respectively, with the passing of risks and with liability for delivery of damaged products; the language "port of entry designated by [SOA]" contained in each is disregarded in favor of Article 9(6)'s clear statement that "The port of entry shall be Baltimore or any other Port location which is approved in writing by [SDC]."

However, that does not mean that SDC is entitled to an injunction that would in effect compel SOA to accept from SDC an LC that contains a term requiring delivery in the Port of Boston. Nowhere in its opposition to SDC's application for injunctive relief has SOA asserted that it intends to make deliveries to SDC at a port other than the Port of Boston, or that it has a right to do so. While the Noonberg Letter implied that SOA might temporarily deliver cars to a port other than the Boston port—while SOA put into effect new

---

**6.** Article 9(6) states: "The port of entry shall be Baltimore or any other Port location which is approved in writing by [SDC]." The parties subsequently agreed, in 1984, that the Port of Boston, rather than Baltimore, would be the port for delivery, and SDC has not approved any other change since that time. (*See* Pl.'s Br., at 31.)

business procedures to meet its needs upon return to the use of documentary LCs—SOA has never indicated that it wants to include any reference to the port of entry in an SDC letter of credit. Thus, SDC's request for an injunction that would bar SOA from getting paid if the vehicles were delivered to the wrong port is neither here nor there. Indeed, this request would be mystifying were it not coupled with SDC's other applications relating to the overarching issue of who dictates the model mix and what, if anything, the other side can do about it.

Turning then to the real issues presented by this part of the motion: SDC asserts, in effect, that a contractually compliant and commercially reasonable letter of credit—even one acceptable to SOA—would have to contain provisions that protect its right to control the model mix in order to prevent SOA from dumping unwanted cars on it. These provisions, in SDC's view, include one that prohibits drawdown of an LC prior to inspection and acceptance of the cars by SDC and another that prohibits drawdown unless preceded by presentation of a written notice specifying exactly what cars are in the truck or on the boat.

Even allowing for the unfortunate deterioration in the parties' relationship (contributed to in no small measure by the lawyerly hystrionics of Messrs Noonberg and Schreiber), there would appear to be little basis for SDC's fear that it will be left with only the slow sellers in Subaru's inventory. As noted above, there is no contention in this suit that SOA has misallocated cars among its various regional distributors to SDC's detriment. (*See* Tr., at 55.) However, regardless of the parties' perceptions and their underlying validity, the bottom line is that this argument is nothing but a convoluted restatement of SDC's first contention—namely, that it has the right to dictate what terms should be included in the letters of credit. On that

basis alone, this portion of SDC's application should be denied.

Even if I do not view SDC's application for a "prohibitory" injunction as simply a restatement of its request for a mandatory injunction compelling SOA to accept letters of credit tailored to SDC's specifications, I would decline to issue any preliminary injunction along the lines requested by SDC in claims 2(a)(I)(A) and (B) of the Order to Show Cause, because SDC is not likely to convince any trier of fact that it is entitled to such relief. SDC believes the inclusion of its requested terms is mandated by the DA and commercial reasonableness because those terms are needed to protect its right not to accept cars it did not order and does not believe it can sell. But that undeniable right does not give rise to an entitlement to the relief SDC seeks.

In reaching this conclusion, I look first to the literal terms of the DA itself. Turning at the outset to the "delivery before payment" point, I note that nothing in that contract gives any explicit guidance about whether SOA may demand payment prior to actually tendering the vehicles for delivery: nothing specifically permits it and nothing specifically prohibits it. Similarly, nothing in the DA addresses SDC's alleged right to inspect tendered vehicles prior to payment, which is the ostensible reason why SDC asserts that such a provision must appear in an LC. Therefore, I must turn to the Uniform Commercial Code for guidance.

Under the UCC, unless the parties have explicitly agreed otherwise, a buyer has the right to inspect goods before *acceptance* of those goods.[7] UCC § 2–606(1) states: "Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity...." Thus, under the

---

7. This is also the logical implication of the New York Dealer Act requirement that a fran-

chisor not force a dealer to accept any vehicle the dealer does not want.

UCC, it would appear that SOA can load up a boat in Japan or a truck in Indiana with whatever Subaru vehicles constitute a fair and commercially reasonable allocation to SDC—even if that allocation does not conform precisely to SDC's purchase order—and can tender delivery of those cars to SDC. When the cars arrive at the Port of Boston, SDC has the right to inspect them, and either to accept each car or to reject it. If SOA delivers non-conforming vehicles, SDC, as provided in the Dealer Act, can reject those vehicles. In that case, they go back onto the boat or the truck—and back to SOA, which took the risk of sending them in the first place.[8]

■ There is nothing illegal about such an arrangement; New York's Dealer Act does not forbid SOA from bargaining with SDC—even if it is hard bargaining—over what cars SDC will take. Such bargaining is quite commonplace, and does not amount to "coercion" under the Act. *See, e.g., General Motors Corp. v. MAC Co.,* 247 F.Supp. 723 (D.Colo.1965) (stating that hard bargaining by manufacturer in franchise negotiation does not of itself subject manufacturer to liability, nor is manufacturer prohibited from enforcing just and reasonable contract provisions even though they may appear burdensome to dealers).[9] Moreover, nothing in the DA prohibits it—including the express provisions concerning SOA's right to accept or reject particular SDC purchase orders and to sell cars on such terms as SDC establishes. (*See* DA, Arts. 9(1) and (2).) Indeed, one might hope that the parties' past course of dealing—negotiating, dickering and reasonably accommodating each other—would continue into the future without direction from a court of law.

Thus, SDC does indeed have a legal right to inspect the cars tendered by SOA, and a concomitant right to reject non-conforming ones. But that does not necessarily mean that it is entitled to inspection (and, hence, in its view, to delivery) prior to payment. While SDC argues that if SOA takes payment by drawdown of the LCs *before* it delivers the vehicles to SDC, then SDC's right to inspect and to reject non-conforming vehicles would be vitiated, its reasoning is fallacious.

SDC argues that UCC § 2–507 prohibits SOA from taking payment prior to tender of the vehicles to SDC. Section 2–507(1) states: "Tender of delivery is a condition

8. It bears noting that the above scenario is not what has happened or is likely to happen between these parties. While neither party has presented any expert evidence about the custom and practice among automobile importers and their distributors with respect to variations between purchase orders and actual deliveries, the parties have presented extensive evidence of their own unvarying practice for over 20 years. Pursuant to their course of dealing, SDC submits a purchase order and SOA, after making its allocation decisions some weeks later, sends an "acceptance" with complete details (car line, color, model codes, etc.) of the vehicles SOA expects to deliver under that purchase order. After the "acceptance," but before shipping, the parties engage in a "dicker" over the model mix and SOA may make adjustments based on SDC's requests. (*See* Lee Decl., attached as Exh. 8 to Def.'s Br., at ¶ 11(d)–(i).) SDC, as noted at oral argument, has not rejected any cars delivered by SOA since 1990. (*See* Tr., at 30.)

9. Both the New York Dealer Act and the Federal Dealer Act protect automobile dealers/franchisees against "coercion" by manufacturers/franchisors. That term has been interpreted to have the same meaning under both Acts. "Coercion" under the Acts has a restricted meaning, and the phrase is not to be liberally construed. *See, e.g., Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901 (9th Cir.1978). The standard is a "good faith dealing" standard, which is more limited than a general good faith standard. *See In re American Honda Motor Co.,* 941 F.Supp. 528, 566 (D.Md.1996) (noting that absence of good faith under Federal Dealer Act is limited concept and does not mean simple unfairness or breach of franchise agreement but, rather, requires actual or threatened coercion or intimidation imposed upon the dealer by the manufacturer); *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.,* 627 F.Supp. 1202, 1209–10 (S.D.N.Y.1986) (noting that in order to lack good faith, a manufacturer must exercise coercion and intimidation and make threats against the dealer) (citing *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 561 (2d Cir.1970)).

to the buyer's duty to accept the goods and, *unless otherwise agreed,* to his duty to pay for them. Tender entitles the seller to acceptance of the goods and to payment according to the contract." (emphasis added.) *Ergo,* unless the parties have come to some different agreement about the time of payment, payment is not due until delivery has been tendered.

However, contrary to SDC's assertions in its long and convoluted letter brief faxed to the Court one week after oral argument, this is an "unless otherwise agreed" case. The DA, to whose literal terms SDC wishes to revert, provides for payment by draw down of documentary letters of credit, but gives SOA the rights to set the terms of those letters of credit. SOA has proposed terms that will allow it, if it chooses, to present certain documents to the issuing bank at any time during shipment and to receive payment.[10] Since there is nothing in the DA that would constrain SOA from setting such terms, it appears to this Court that, by providing that payment will be effected through documentary letters of credit acceptable to SOA, the parties have "otherwise agreed" that SOA can call the tune—again, provided its choice of terms is commercially reasonable.

There can be no doubt that payment before tender is commercially reasonable. Official Comment Two to UCC § 2–507 states that "[t]he 'unless otherwise agreed' provision ... is directed primarily to cases in which payment in advance has been promised *or a letter of credit term has been included.*" (emphasis added.) In other words, where a letter of credit is being used for payment, the UCC anticipates that the terms of the letter of credit will control the time of payment. Moreover,

the UCC affords SDC adequate rights and remedies in the event it decides not to accept cars for which it has already paid. UCC § 2–512(2) provides that where a contract term—in this case, a term of a letter of credit acceptable to SOA—requires payment before inspection, "[p]ayment ... does not constitute an acceptance of goods or impair the buyer's right to inspect or any of his remedies." And section 2–711(1) states that "[w]here the seller fails to make delivery ... or the buy rightfully rejects ... any goods involved, ... the buyer may ... recover[ ] so much of the price as has been paid...." Thus, SDC has an action at law to recover the price of any rightfully rejected vehicle.

Yet another provision of the UCC undercuts SDC's argument that its right to inspect and reject non-conforming vehicles will be vitiated unless inspection precedes payment. UCC § 2–513(3) states, in pertinent part, that "[u]nless otherwise agreed ... the buyer is *not* entitled to inspect the goods before payment of the price when the contract provides ... (b) for payment against documents of title...." This is exactly what a documentary credit is—a method of receiving payment upon presentation of documents rather than presentation of the goods. Thus, under the governing law, and where the contract is otherwise silent (as the DA is), it is *presumed* that payment is not contingent on the buyer's right to inspect when payment is made by way of a draw down on a letter of credit. The reason is obvious—no bank wants to become embroiled in a dispute over whether a particular car conforms or does not conform to SOA/SDC's underlying contract obligations.[11]

SDC cannot have it both ways: if it compels a return to the long-abandoned

---

10. One of the terms SOA demands in the Noonberg Letter is that all LCs "be payable on presentation of documents within SOA's exclusive control." *See* Noonberg Letter, at 2. In other words, SOA wants to reserve the right to take payment by presentation of documents to SDC's bank without first presenting documents to SDC or delivering the vehicles to SDC. SOA also demands in the Noonberg

Letter that the LCs contain no term that requires SDC's inspection of the vehicles as a precondition to draw down.

11. And in fact banks are protected from this by provisions in both the UCC and the Uniform Customs and Practice For Documentary Credits (the "UCP"), which set forth the obligations of banks to its applicants when paying

documentary letter of credit method of payment, it will simply have to live with certain terms that may not be to its liking. SDC's effort to convince this Court that payment before delivery of the vehicles would force it to waive its right to inspect and abandon its right to reject under the UCC and the New York Dealer Act is unavailing. Read correctly, the UCC's provisions reveal that payment before delivery does not waive SDC's right to inspect and to accept or reject.[12] Therefore, SDC has not shown a likelihood of success on the merits of its claim that its contractual and UCC rights would be violated if SOA included terms allowing it to draw down the letters of credit prior to tender of delivery and inspection of the vehicles.

For much the same reasons, SDC is not entitled to a preliminary injunction that would prohibit SOA from refusing to deliver a written notice of conforming tender to SDC or from excluding such a notice from among the presentation documents. As already noted, this is really just a convoluted restatement of SDC's request for a mandatory injunction. Nothing in the DA compels SOA to deliver any document to SDC or to include or exclude any particular document from among those to be presented to the bank at the time of payment. SDC has no more right to prevent SOA from excluding such a term in the LC than it has to dictate the inclusion of that term. Furthermore, as the above presentation makes clear, there is nothing either illegal or commercially unreasonable about SOA's refusal to offer such a notice prior to draw down, as the UCC and the New York Dealer Act more than adequately protect

SDC in the event of an unacceptably non-conforming tender.

iii. *SDC Is Not Likely To Succeed On Its Claim That SOA May Not Draw Down on the LCs Before SOA Has Delivered to SDC (at least 30 days before draw down) a List Containing the Vehicle Identification Number (VIN) or Vehicle Order Number (VON), Model Code and Color of Each Vehicle Ordered* (Claim 2(a)(I)(C) of the Order to Show Cause)

This claim by SDC is identical to the claims resolved above, in points (i) and (ii). Because SDC is not entitled to determine the model mix of vehicles that SOA delivers, and is not entitled to deny payment under the LCs for non-conformity prior to inspection and rejection, it is not entitled to demand that SOA deliver VINs, VONs, or any other vehicle-specific information as a precondition to draw down. Whether under the higher or lower standard, SDC has not demonstrated a likelihood of success on the merits of this claim.

iv. *SDC Is Not Likely To Succeed On Its Claim that SOA May Not Draw Down on the LCs Before SOA Has Delivered to SDC (at least five business days before draw down) Commercial Invoices For Vehicles Ordered and To Be Delivered (in the form to be presented to SDC's bank)* (Claim 2(a)(I)(D) of the Order to Show Cause)

This claim, too, is indistinguishable from the claims already resolved above. The contract gives SDC no right to demand any particular documents from SOA prior to vehicle delivery or draw down; neither does the UCC. SOA will have to provide

the beneficiary under a letter of credit. LC issuers deal only in documents and, unless otherwise agreed, have no responsibility to assure performance of the underlying contract. Both UCC § 5–109 and UCP Article 7 provide, in substance, that the issuer must examine documents with reasonable care to ascertain that on their face they appear to comply with the terms and conditions of the credit. The issuer's obligation to its customer includes good faith and observance of any

general banking usage, but unless otherwise agreed does not include liability or responsibility for performance of the underlying contract for sale between the customer and the beneficiary.

12. SDC, like SOA, is bound to act in a commercially reasonable manner when making vehicle ordering and acceptance decisions. *See* p. 462, *supra*. Specifically, SDC may not use the ordering process as a means to avoid its quota obligations.

commercial invoices to SDC's *bank* as draw down documents because, under the DA, title to vehicles does not pass until the cars have been invoiced and the invoices paid. Since title must pass to SDC in order for the bank to obtain its security interest in the vehicles, no commercial lender would issue an LC that did *not* provide for presentation of an invoice prior to draw down.

But SOA has no obligation to provide those invoices to *SDC* prior to delivery or prior to payment. Once again, SDC is trying to bootstrap its undeniable right to inspect and reject into a non-existent right to dictate terms that the DA permits SOA to control. SDC has not shown any likelihood of success on the merits of its claim that it can demand these documents from SOA before SOA draws down on the letters of credit.

v. *SDC Is Not Likely To Prevail on the Merits of Its Claim that SOA May Not Draw Down An LC Before the First Day or After the Last Day of the Second Month Following That LC's Issuance.* (Claim 2(a)(II) of the Order to Show Cause)

 SDC has argued that SOA should be enjoined from drawing down a letter of credit prior to the first day of the second month after issuance, and also that each LC ought to expire by its own terms on the last day of that same month. Thus, if an order is placed in January, supported by an LC, SDC argues that the LC cannot be drawn down prior to March 1, or after March 31. In negotiations, SOA proposed that there be no earliest date for draw down and that the LCs expire no earlier than the fourth month after issuance. In other words, SOA would have the January letter of credit expire on May 31.

SDC cannot demonstrate a likelihood of success on the merits of its claim that the so-called "extended expiry" term SOA seeks would violate SDC's rights under

the Distributor Agreement.[13] The Agreement simply does not require SOA to deliver the cars within the second month after the order is placed and the LC issued. While the DA and the practice of the parties over the years suggests that an order placed in January is intended by both sides to be delivered sometime in or around March, there is no express or implied limitation on late deliveries. Indeed, Article 9(13) absolves SOA from any liability for late deliveries that are caused by almost anything, including the vagaries of the manufacturing process or late shipments from Fuji. SOA's desire to be secured by the letters of credit during the entire period during which it is entitled to make delivery is not commercially unreasonable. SOA is entitled to be paid for all the cars it delivers to SDC, including cars delivered "late." Therefore, if SDC wants to use a documentary LC for payment, that LC cannot expire until all the cars covered by the particular order corresponding to that particular LC have been delivered. Otherwise, SOA would have no assurance of payment for late deliveries.

Similarly, SDC's contention that an LC cannot be drawn down until the first day of the second month after issuance has no merit. There is absolutely nothing in the contract prohibiting SOA from making "early" deliveries. If SOA makes untimely deliveries that are *not* excused by Article 9(13), SDC has normal recourse for breach of contract.

vi. *SDC Is Not Likely To Prevail on the Merits of Its Claim that SOA May Not Draw Down On the LCs Before Delivering to SDC's Bank "Such Documents Necessary to Give the Bank Reasonable Commercial Assurances that Title in the Vehicles has Passed to SDC."* (Claim 2(a)(III) of the Order to Show Cause)

 SDC asserts that it would violate the DA and be commercially unreasonable

---

**13.** SOA asserted at oral argument that, while it has offered for the present to set an expiry date of the end of the fourth month after issuance of the letter of credit, it is entitled

under the DA to have a letter of credit with no expiry date at all. I agree that this is a correct interpretation of the DA.

for SOA to be able to draw down on an LC unless it first tenders documents that give the issuing bank reasonable commercial assurances that title to the vehicles has in fact passed from SOA to SDC. SDC insists that the following draw down documents are required for this purpose: documents of title for each vehicle; a bill of sale conveying title to each vehicle; three copies of commercial invoices identifying vehicles by model code, color and price; a list of VINs for all vehicles in such invoices; and a certificate verifying that the vehicles identified have all been delivered to SDC. SDC argues that SOA may not take payment for cars before it delivers them because SOA would then be paid for the cars while still retaining title to them (and SDC's bank would have no security interest in the vehicles). SDC believes this would violate its rights under the contract, and asserts that it has, since 1981, been allowed to generate title documents before the cars arrive in the Port of Boston and to take title to the cars before paying for them.

This claim is nothing more that SDC trying by the back door to get what it cannot get through the front door—i.e., SDC is once again trying to dictate what documents are to be tendered under the letters of credit. As already explained, SDC cannot dictate the LC terms because the contract is silent as to what documents are to be tendered and SOA is entitled to have a letter of credit acceptable to it. The only remaining inquiry, then, is whether it violates the DA or is commercially unreasonable for SOA to take payment under the LCs without first tendering documents to SDC. It is neither.

The DA provides that "[t]itle to the [vehicles] shall remain with [SOA] and [SOA] shall have the right to retake and resell the [vehicles] sold until [SOA] shall have invoiced the [vehicles] to [SDC] and shall have received good collected funds in payment of the full purchase price thereof." (1981 Letter Agreement, amending Article 9(5), attached as Exh. 22 to Pl.'s Br.) Thus,

amended Article 9(5) explicitly states that title passes to SDC as soon as SOA invoices the vehicles and is paid. No appropriate time for invoicing and taking payment is specified. It may happen before or concurrently with physical delivery of the cars to SDC, depending on how SOA chooses to do business under the documentary letter of credit system. But whenever SOA decides to tender the documents required under the LC and draw down its payment, SDC will take title—and SDC's bank will have its security interest in the vehicles, wherever they may be in the delivery system. Under Article 9(7), SOA will continue to bear the risk of loss if the vehicles are in transit, even if title has passed; whether SOA wants to be in the posture of covering risks on cars it no longer owns is for it, not SDC, to decide. Therefore, SDC cannot show a likelihood of success on the merits of its claim that it would be extra-contractual and unreasonable for SOA to decline to accept an LC that required presentation of such documents to SDC.

This conclusion may appear, on first blush, to conflict with my earlier reliance on UCC § 2–513 with respect to SDC's obligation to make payment before inspection when the contract provides for "payments against documents of title." (emphasis added) I note, however, that this UCC provision cannot be read in isolation from related provisions or from the definitions of its terms. UCC § 1–201 states: "[I]n this Act: (15) 'Document of title' includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers...." The New York Court of Appeals has explicitly held that a certificate of title under the Vehicle and Traffic Law—the title document SDC wants SOA to provide, and the document SDC has told the Court is the

only means by which it can actually take title in New York and New Jersey (both title states)—is *not* a "document of title" within the meaning of the Uniform Commercial Code. *See Dairylea Co-op. Inc. v. Rossal,* 64 N.Y.2d 1, 483 N.Y.S.2d 1001, 473 N.E.2d 251 (1984). Therefore, section 2–513 does not conflict with SOA's right under the DA to draw down on SDC's LC before presenting vehicle title certificates to SDC.[14]

UCC § 1–201 and the *Dairylea* case further support my earlier conclusion that SDC is unable to show a likelihood of success on the merits of its claim that its rights under the DA and the UCC will be violated if SOA includes letter of credit terms allowing it to take payment without *first* passing vehicle titles to SDC. SOA simply must provide the bank with whatever "documents of title"—bills of lading, commercial invoices, copies of the purchase order—are specified on the face of the letter of credit to be required for draw down of the credit. The bank is then required to examine the documents with reasonable care to ascertain that they appear on their face to comply with the terms of the credit. (*See* UCC § 5–109; UCP Article 7.) If they do, then SOA is paid and title passes at that time.

That said, it bears noting that in 1975, when the DA was signed, both SDC and SOA contemplated that SOA would identify the vehicles it was delivering to SDC to the corresponding purchase order (or any negotiated variant of same) and would draw down on the *particular* letter of credit accompanying that purchase order. Indeed, UCC § 2–401 requires, as a prerequisite to the passing of title to goods, that the goods be "identified" to the contract (which in this case means to each purchase order). Unless otherwise

agreed, identification to the contract occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." UCC § 2–501(b). Therefore, it would be commercially unreasonable and would violate the parties' expectations if SOA limited its documentary presentation under the letters of credit to documents stating it had "delivered *Subaru vehicles* to SDC," but without reference to the particular purchase order under which it was making delivery.

vii. *SDC Is Likely To Prevail on the Merits of Its Claim That SOA May Not Impose Liability on It For Charges Incurred Upon Transfer of SOA's Rights As Beneficiary Under the LCs, But Is Not Entitled To An Injunction Because It Has Not Demonstrated Imminent Irreparable Harm.* (Claim 2(a)(IV) of the Order to Show Cause)

■ SDC asks the Court to enjoin SOA from demanding a letter of credit term that would impose on SDC any charges incurred if SOA chooses to transfer its rights as beneficiary under the letters of credit. (The parties do not dispute that SOA's rights to payment under the credits are transferable.)

I find that SDC has shown a likelihood of success on the merits of its claim that a provision imposing transfer costs on SDC would violate its rights under the contract. While the contract is silent as to transfer charges under letters of credit which accompany quota purchase orders, Article 9(4) explicitly shifts to SDC "all collection charges and costs of exchange, if any, incurred in connection with its payments" on *non-quota* orders. As the contract must be construed against the drafter,[15] SOA, I

---

14. Of course, SOA is contractually obligated to pass title to SDC after invoicing and upon receiving payment. If it is required to tender a vehicle title certificate to SDC at the same time it receives payment from the bank in order to accomplish the passage of title, it will do so. But that does not give SDC the right

to a vehicle title certificate *before* invoicing and payment.

15. *See, e.g., Aramony v. United Way of America,* 28 F.Supp.2d 147, 167 (S.D.N.Y.1998) ("It is generally accepted that ambiguities in contract terms are construed against the

find that the absence of such a term shifting transfer costs to SDC with respect to quota purchase orders means the parties intended those costs to fall on SOA. Further supporting this result, Article 54(d) of the UCP provides that, unless otherwise specified by the parties, the beneficiary bears charges incurred due to transfer of its rights under a letter of credit.

■ Although SDC is likely to succeed on the merits of this claim, it faces no threat of irreparable harm, even if SOA insists on including a transfer cost term in the letters of credit. Assuming SOA were to transfer its rights sometime in the future and impose a charge on SDC, the expenditure can be remedied by money damages. It would, therefore, be improper to grant injunctive relief with respect to this issue.

E. *While SDC Is Not Likely To Prevail on the Merits of Its Claim That SOA Cannot Compel It to Pay for Vehicles That Do Not Conform to Its Purchase Order, It is Likely to Prevail on the Merits of its Claim That SOA Cannot Compel It to Accept Delivery of Non–Conforming Vehicles.* (Claim 2(b) of the Order to Show Cause)

■ SDC asserts that it is not required to accept delivery of vehicles that do not conform to its monthly quota purchase orders and it asks this Court to enjoin SOA from enforcing any demand made through the Noonberg Letter that SDC accept such non-conforming deliveries. Putting aside the fact that the Noonberg Letter neither makes a demand that SDC accept non-conforming vehicle deliveries nor threatens it with termination if it fails to do so, I have already determined that the New York Dealer Act prohibits SOA from demanding that SDC accept delivery of cars it does not want, and that the UCC affords SDC the right to recover anything it has paid SOA in respect of a

rightfully rejected car. (*See* UCC §§ 2–512(2) and 2–711(1); *see also* pp. 462–63, *supra.*) Therefore, there is no threat of imminent irreparable harm to SDC on this claim, and SDC's motion for a preliminary injunction is denied.

F. *SDC is Likely to Prevail on the Merits of Its Claim That SOA Cannot Compel It to Place Its Next Order Until One of the Three Outstanding Letters of Credit Has Been Fully Drawn Down, But is Not Entitled to an Injunction Because It Has Not Demonstrated Imminent Irreparable Harm* (Claim 2(c) of the Order to Show Cause)

■ SDC's next contention—which has proven the most difficult to resolve of all the disputes between the parties—concerns when it must place its next successive order and post its next letter of credit under the Article 7(3) quota regime. The Distributor Agreement provides as follows:

> Within seven days after each letter of Credit becomes an acceptance, the Distributor shall order for the next month of the contract year an additional ½2 of the annual minimum requirement as set forth in Exhibit B hereof. The order shall be accompanied by a domestic, irrevocable Letter of Credit in favor of [SOA].

I would like to think that this provision made sense when it was drafted; it does not make sense today. The one and only thing on which everyone—the parties and all their experts—currently agree is that this language is nonsense.

First, letters of credit do not become "acceptances." There is a form of financing known as "acceptance financing" pursuant to which letters of credit are "accepted" by banks. A "time" or "acceptance" LC gives rise to an acceptance when the bank dates, signs and stamps

drafter.") (citing *Kerin v. United States Postal Service,* 116 F.3d 988, 992 (2d Cir.1997)). *See also* Restatement (2d) of Contracts, § 206

(1979) (*contra preferentem* doctrine of interpretation against the drafter).

"accepted" upon the draft presented by the beneficiary.[16] In that case, one might say (albeit inelegantly) that the letter of credit became an "acceptance" when the beneficiary's *draft* was "accepted" by the bank. But the parties to this agreement never used acceptance financing. In the early years of their relationship, SOA drew down on documentary letters of credit by making a presentation of the documents specified on the face of the LC and receiving payment upon "sight"—meaning payment after the examination of the conforming documents within "... a reasonable time, not to exceed seven banking days following the day of receipt...." UCP Article 13(b); *see also E & H Partners v. Broadway Nat'l Bank,* No. 96 Civ. 7098, 1998 WL 734356, at *12 (S.D.N.Y. Oct.20, 1998). Because the early orders were small, and were delivered in one fell swoop, an LC was extinguished upon draw down and no one worried about whether it had become an "acceptance." As orders grew larger and not all the cars could be delivered in a single lot, the parties switched to the use of standby letters of credit, precisely to avoid multiple draw downs on a single LC. Because the parties have been employing SDC's letters of credit as security, not using them as a mechanism to effect payment, since 1981, they have never had to consider what the obtuse language in the DA about an "acceptance" might mean in the context of multiple deliveries and drawdowns.

Now that SDC wants to revert to the letter of the contract, the issue is squarely presented. Neither party has the slightest intention of converting to acceptance financing, which might give the contract language a modicum of meaning. Instead, they acknowledge its essential meaninglessness and then suggest ways in which I might construe it to their respective advantages.

SDC contends that an LC becomes an "acceptance" when it is fully drawn down and extinguished. If SDC is correct, it does not have to place a quota order for Month D until seven days after all the cars ordered for Month A have been delivered and the supporting letter of credit is no longer on the books. This, SDC asserts, would enable the parties to achieve what appears to have been contemplated by the original language, which was that SDC would have only three letters of credit outstanding at any one time. SDC argues that the parties' longstanding practice of having exactly three letters of credit outstanding at all times—even under the standby LC system, where those LCs were rarely drawn down—supports the inference that it never needs to have more than three LCs outstanding at any one time. SDC argues that the only way to accomplish that result if the parties revert to a documentary payment scheme is to read Article 7(3) as SDC reads it. As a matter of logic, SDC is correct.

The main problem with SDC's interpretation—that one LC must be fully drawn down before another is issued—is that it could result in a severe disruption to the normal monthly ordering system the parties have followed for years, and which the contract quite clearly contemplates. If a shipment of cars is delayed for an excusable business reason, such as one of those enumerated in Article 9(13), then SDC's obligation to order the next $\frac{1}{12}$ of quota would not be triggered, because the corresponding LC would not be drawn down and extinguished. The ordering system would fall behind its monthly schedule, thereby increasing the likelihood that future orders, when finally placed, would also be delivered later than otherwise expected.

SOA argues that every separate draw down under Month A's letter of credit

---

**16.** Use of this type of LC gives rise to a "bankers' acceptance," which functions as a financing device for the LC applicant. A beneficiary wishing to be paid immediately against a bankers' acceptance must discount that acceptance in exchange for immediate payment.

constitutes an "acceptance" and therefore urges that SDC must place its order for Month D within seven days after the first shipment of cars is delivered and paid for by a partial drawdown under Month A's letter of credit. To SDC's argument that this might result in its having more than three letters of credit outstanding at any one time (part of Month A's, plus the letters for Months B and C and the new letter supporting the order for Month D), SOA says that this may be what the contract literally requires. But it asserts that it would never require SDC to have letters of credit outstanding in an amount greater than the sum due under three months worth of purchase orders. Put otherwise, if SDC had to post a letter of credit against month D's order while part of Month A's letter was still outstanding, the new letter of credit would only have to equal the difference between the amount still outstanding on Months A's letter of credit and the total amount due for Month D's order. Presumably, as more cars were delivered against Month A's letter and it was further drawn down, the face amount of the letter of credit posted against Month D's order would be increased. Eventually, at the time Month A's letter of credit was extinguished, Month D's letter would be in an amount equal to the cost of a full month's order.

Simply trying to describe SOA's argument gives the lie to any thought that it might be what the contract requires. The arrangement is cumbersome. It forces SDC to incur multiple additional transaction costs each time it changes the amount due under the newest letter of credit—which could end up being every two or three days, if deliveries from Japan and Indiana came that frequently. And it does not have the slightest support in the literal language of the contract, which—assuming it means anything at all—at best fairly implies that the number of letters of credit outstanding at any given time be no more than the number of orders outstanding, and that there will never be more than three orders outstanding. Certainly, noth-

ing in the language of the DA supports the notion that the face amount of whatever letters of credit are outstanding must total the full cost of three months' worth of cars, even if those cars have already been paid for. It appears that SOA is trying to tailor an argument to conform to the practice of the last 18 years (pursuant to which three full-value LCs were always in place). But, as noted above, the parties walked away from the DA when they came up with that *modus operandi*. Thus, their past practice offers no evidence about what the terms of the DA mean.

There is, of course, a third possibility—one that is suggested by the course of conduct the parties have followed for the past 24 years. Recognizing that the quota system calls for SDC to place $\frac{1}{12}$ of its orders at a time, SDC has always placed its next order by the seventh day of each succeeding calendar month. Indeed, in its application for a preliminary injunction, SDC refers to this as the "monthly" quota order, and the DA sets out the parties' respective obligations in terms of months. This *modus operandi*, which until recent hostilities had been perfectly satisfactory to both sides, acknowledges the reality that cars need to be ordered on a regular basis so as to ensure that SDC always has cars on its lots while reasonably reflecting the system by which Fuji supplies cars to SOA. However, there is no denying that this eminently sensible arrangement is not reflective of the relevant language in the DA. I am thus constrained to conclude that SDC's interpretation makes the most sense and preserves what appears to have been contemplated when the DA was negotiated. Therefore, SDC is likely to succeed on the merits of its claim that it is not obligated to place its next quota purchase order until one of the three outstanding LCs has been extinguished. SOA cannot terminate SDC for failing to place its next order until seven days after that occurs.

This does not leave SDC holding all the cards. In order to protect its own busi-

ness, and to ensure a constant flow of inventory, SDC may opt to place an order each month, in spite of the fact that part or all of one of its previous orders remains outstanding. If it does so, it will have to post another LC, because every order must be accompanied by an LC. SOA, to protect its interests, may choose to "marshal" cars as they are delivered into the United States and tender delivery only when a large number of cars are available. This could end up being quite disruptive to SDC's business, since there will be no guarantee that cars will be continuously available. Another and more likely possibility is that SOA will present the documents necessary to pass title and enable it to draw down the letter of credit well before the cars have arrived in the United States, simply in order to trigger SDC's obligation to place a new order. Certainly, such a system is legally feasible in light of my prior rulings. I can but note again, as I have throughout this opinion, that both sides will have to deal with adverse consequences if they cannot work out their differences.

Because SDC is likely to succeed on the merits of its claim that SOA cannot compel it to place its next quota order or post its next LC until one of the three outstanding LCs has been extinguished, I must also determine whether SDC faces the threat of irreparable harm. SOA's only means of *compelling* SDC to place an order or post an LC at a specific time is to exercise its power to terminate SDC's distributorship. This Circuit has recognized that a manufacturer's notice of termination threatens irreparable harm when termination of the franchise would obliterate the dealer's entire business. *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (*cited in Tom Doherty Assocs., supra*, 60 F.3d at 37 (2d Cir.1995)). SDC's sole business is the sale of Subaru vehicles it receives from SOA, and thus termination by SOA of its Subaru distributorship would necessarily constitute irreparable harm. But because the New York Dealer Act provides SDC with the right to a 90-day notice of termination from SOA, SDC faces no *imminent* threat of termination from SOA. Therefore, there is no danger of imminent irreparable harm to SDC absent the issuance of a preliminary injunction, and I decline to grant one. *See, e.g., Brooks v. Giuliani*, 84 F.3d 1454, 1468 (2d Cir.1996) (an injunction is unavailable absent a finding of an actual and imminent threat of harm); *Salant Acquisition Corp. v. Manhattan Indus.*, 682 F.Supp. 199, 202 (S.D.N.Y.1988) ("Only if plaintiffs demonstrate that the alleged threat of harm is 'actual and imminent,' rather than merely 'remote or speculative,' will preliminary relief be granted.")

G. *SDC Is Not Likely To Prevail on the Merits of Its Claim That SOA Must Meet Any Particular Timetable for Accepting or Rejecting Purchase Orders.* (Claim 2(d) of the Order to Show Cause)

 SDC also asks the Court to enjoin SOA from refusing to accept or reject SDC's monthly quota purchase orders within a time frame desired by SDC—namely, no later than four days before the date on which SDC must submit its next quota purchase order. This is a request for a mandatory injunction that would compel SOA to take the action of accepting or rejecting each order within SDC's preferred time frame. SDC is unable to show a clear and substantial likelihood of success on the merits of its claim that it can impose such an obligation on SOA. In fact, it shows no likelihood of success at all, because this is yet another of those things about which the DA offers SDC no right to make demands.

Article 9(2) of the Distributor Agreement, which deals with orders and acceptances, states in full:

[SDC] shall furnish its orders for [vehicles] to [SOA] on forms supplied by [SOA] from time to time. Such orders shall be for delivery to [SDC] during such period or periods as [SOA] may from time to time indicate, and all such

orders may be accepted by [SOA] in whole or in part. Such acceptance shall be valid only if made by notice in writing to [SDC]. Except as otherwise expressly provided in paragraph 1 of this Article 9 [related to pricing], all orders of [SDC] shall be binding upon it unless and until they are rejected in writing by SOA provided, however, that in the event of a partial acceptance by [SOA], [SDC] shall no longer be bound with respect to the parts of the order not accepted.

Nothing else in the contract bears on the acceptance of orders by SOA. There is no requirement in the DA that SOA must accept or reject within a specific time frame. What has happened in the past I have described above—the purchase order went in, SOA notified SDC what variant of the order it "accepted," and the parties "dickered" afterward about what cars actually went onto the boat or truck for delivery. In an ideal world, the parties would continue to do business in this way.

While it would undoubtedly be more convenient for SDC to know before it places its next order what cars SOA plans to ship under its previously placed orders, SDC seeks now to do business by the letter of its Agreement. Therefore, SDC's motion for injunctive relief is denied.

H. *SDC is Not Likely to Prevail on the Merits of Its Claim That No Orders Need Be Placed In the Last Three Months of the Calendar Year. Furthermore, SDC Is Not Entitled to Partial Summary Judgment on This Claim, and SOA Is Entitled to Partial Summary Judgment.* (Claim 2(e) of the Order to Show Cause)

▆▆ SDC asserts that it is not required to place monthly quota purchase orders during the last three months of each calendar year. It contends that it is to place ¼ (3 times 1/12) of its annual quota orders each year in January, for delivery in January, February and March. In addition to seeking a preliminary injunction

prohibiting SOA from forcing it to place orders during the last calendar quarter,[17] SDC has also moved for partial summary judgment in its favor on this issue.

SDC cannot demonstrate a likelihood of success on the merits of this claim because its argument is at odds with the clear language of the DA. Article 7(3) of the DA indicates on its face that $\frac{1}{12}$ of SDC's annual quota is to be ordered each and every month of the calendar year. Therefore, SDC is not entitled to a preliminary injunction, or to summary judgment. Indeed, SOA is entitled to summary judgment dismissing this particular claim.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if there is no genuine issue of material fact...." Fed.R.Civ.P. 56(c). The burden of proof is on the moving party to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the opposing party and must give that party the benefit of all reasonable inferences to be drawn from those facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court may search the record and grant summary judgment to a non-moving party if there are no disputed issues of material fact and that party is entitled to judgment as a matter of law. *See, e.g., Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citing *Celotex Corp.,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983); *Aviation Dev. Co. v. C & S Acquisition Corp.,* No. 97 Civ. 9302, 1999 WL 123718, at *2 (S.D.N.Y. March 8, 1999).

---

17. SDC would be hard pressed to convince this Court that it faced any threat of imminent termination on this ground, as October is six months away.

There are no disputed issues of material fact on this question; it is a simple matter of contract construction. Article 7(3) is clear on its face that SDC must order ¹⁄₁₂ of its annual quota during each month of the year. Article 7(3) states: "Within seven days after each Letter of Credit becomes an acceptance, the Distributor shall order for the next month of the contract year an additional ¹⁄₁₂ of the annual minimum requirement as set forth in Exhibit 'B' hereof. . . . *This procedure shall continue throughout the Contract year.*" (emphasis added)

SDC argues that "[t]his procedure" includes an earlier paragraph of Article 7(3), which reads: "Simultaneously with the execution of this Agreement, Distributor shall order for the first month of the contract year, ¹⁄₁₂ of the annual minimum set forth on Exhibit 'B,' for the second month of the Contract year, ¹⁄₁₂ of the annual minimum set forth on Exhibit 'B,' and for the third month of the Contract year, ¹⁄₁₂ of the annual minimum as set forth in Exhibit 'B'." SDC asserts that this means it can withhold orders during the last quarter of any year and place three months' worth of orders the following January. Such a reading of the contract is absurd. The "execution" of the Agreement happened only once, in January 1975. At that time, SDC was required to submit three purchase orders—"simultaneously with the execution." The reason for this one-time requirement is clear. In order to catapult itself into the "three orders outstanding" cycle contemplated by the DA, SDC needed to place an initial order for three months' worth of cars. Once into the cycle, however, it remained in the cycle by placing a new order each month (or, under the regime contemplated by Article 7(3)'s literal language, each time an old LC was extinguished) "throughout the Contract year." The contract year ends in December, not September. It is thus clear to me that SDC's proffered interpretation of Article 7(3) is incorrect, and that the submission of three orders in a single month was intended by the parties to happen but once—when the Agreement was executed. This conclusion is supported by commercial reality (the need to plan deliveries and the impossibility of delivering cars in the same month they are ordered), as well as logic and the unvarying practice of the parties over the past two-plus decades.

SDC's argument that it cannot place orders during the last three months of the year because its quota for the next year has yet to be negotiated is far from compelling. SDC can certainly place orders based on its current year quota and then make up for any shortfall or· overage as soon as the new quota is negotiated or set by the default procedure provided for in Exhibit B. Or, more likely, the parties intended that SDC would place twelve orders under one quota throughout a single contract year and then begin placing a further twelve orders under the new quota in January. Either reading of the DA is more tenable than SDC's.

Therefore, I find that SDC is required to submit a quota purchase order in October, in November and in December ·of each year, and I grant, *sua sponte*, partial summary judgment to SOA on this issue.

I. *SDC's Motion For a Preliminary Injunction Prohibiting SOA From Terminating SDC's Franchise for Its Failure to Include Letter of Credit Terms or to Comply With Vehicle Ordering,*`·`*Delivery and Acceptance Conditions is Denied.* (Claim 3 of the Order to Show Cause)

SDC's final claim is, in effect, an anticipatory motion to forestall termination of SDC's distributorship. Specifically, SDC asks this Court to enjoin SOA from either terminating or threatening to terminate the distributorship based on SDC's refusal to provide any of the letter of credit terms addressed above or SDC's failure to meet any other SOA demand discussed above. I have determined that SDC is likely to succeed on the merits of its claims that SOA must deliver to the Boston port, that SOA may not force SDC to *accept* non-

conforming vehicle deliveries, and that SOA may not force SDC to place its next purchase order and post its next letter of credit until seven days after the earliest letter of credit has been fully drawn down. Therefore, SDC similarly shows a likelihood of success on the merits of its claims that *termination* of the distributorship by SOA would be wrongful if that termination were based on SDC's failure to accept deliveries at a port other than Boston, refusal to accept non-conforming vehicle deliveries, or refusal of SDC to place its next order before the earliest letter of credit has been fully drawn down.

However, as discussed above, there is no threat of imminent and/or irreparable harm with respect to any of these issues. SOA has not asserted a contractual right to change the port, and has not contested SDC's assertion that, under the DA, SDC must approve any change to the port of entry. Similarly, I have found no threat of irreparable harm with respect to the issue of non-conforming vehicle deliveries and SDC's right to accept or reject. SOA acknowledged at oral argument that it is forbidden by the New York Dealer Act from forcing its distributors to accept vehicles they did not order and do not want to take. Therefore, there is no *imminent* threat that SOA will send SDC a termination notice based on SDC's refusal to accept nonconforming cars. SOA would clearly lose a legal challenge to such a termination, and SDC would have plenty of time to make such a challenge—90 days under the Dealer Act—and to avoid any threatened harm. Finally, with respect to the timing of new orders and posting new LCs, I have already found that SDC does not face an *imminent* threat of termination from SOA on this ground.

Of course, if SOA chose to issue a termination notice on any of the above grounds, SDC could return to court and renew its motion for a preliminary injunction. I therefore deny this portion of its application without prejudice to renewal.

## Conclusion

As recently as two weeks ago, the Second Circuit Court of Appeals observed that, "Simplicity and certainty are the hallmarks of the letter of credit transaction...." *3Com Corp. v. Banco do Brasil, S.A.,* No. 98 Civ.7658, 1999 WL 152561, at *5 (2d Cir. March 22, 1999). Both SDC and SOA would do well to heed that observation. Using a financing document as a vehicle to force resolution of contract disputes is often inappropriate and unwise. Here, fortunately, the DA effectively precludes it.

SDC's motion for a preliminary injunction is denied on all grounds, with prejudice, except as noted above. SDC's motion for partial summary judgment is denied and SOA is awarded partial summary judgment dismissing the portion of SDC's First Claim that seeks declaratory relief as requested in ¶¶ 86(f) and (h) of the Complaint.

This constitutes the decision and order of the Court.